Lucia **BENNETT**, Plaintiff,

v.

**NEW YORK CITY DEPARTMENT OF CORRECTIONS and Richard Koehler as Commissioner of the New York City Department of Corrections, Defendants.**

**No. 86 Civ. 4368 (MBM).**

United States District Court,
S.D. New York.

Feb. 3, 1989.

C. Vernon Mason, New York City, for plaintiff.

Peter L. Zimroth (Norma A. Cote, of counsel), Corp. Counsel of the City of New York, New York City, for defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Defendants the New York City Department of Corrections (DOC) and Richard Koehler, as Commissioner of DOC, move for summary judgment dismissing plaintiff Lucia Bennett's suit alleging race and sex discrimination. Fed.R.Civ.P. 56(b). For the reasons below, defendants' motion is granted in part and denied in part.

I

Bennett is a black woman and a Corrections Officer who has worked at The Bronx

Men's House of Detention (the prison), a DOC facility, since August 31, 1983. The summary judgment motion requires that the record be viewed in the light most favorable to her, with all reasonable inferences drawn in her favor. *Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 57 (2d Cir.1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962) (*per curiam*)).

Almost immediately after beginning work at the prison, Bennett's male colleagues and superiors subjected her to unwelcome sexual advances, coarse sexual humor about herself and others, sexual graffiti relating to her, and an unconsented sexual touching. A fellow Corrections Officer also subjected her once to a tirade laced with obscenities, sexual epithets, and a racial slur, and she faced a difficult time obtaining the computer training she felt was necessary to advance her career. In a memorandum dated December 23, 1983, Bennett complained of one incident of harassment; after being interviewed by prison officials, she provided further examples of harassment in a January 27, 1984 memorandum. The last reported incident of harassment took place sometime in January 1984.

On May 17, 1984, plaintiff commenced administrative proceedings before the Equal Employment Opportunity Commission (EEOC), asserting race and sex discrimination. On November 15, 1984, she amended her original EEOC filing to include a charge of retaliation. On September 18, 1985, Bennett was issued a right-to-sue letter on her retaliation claim, and sometime thereafter, was issued a right-to-sue letter on her original discrimination claims. That second right-to-sue letter never reached Bennett, and therefore was reissued on March 6, 1986. This action ensued on June 4, 1986.

The original complaint sought relief for employment discrimination based on race and sex, retaliation, and tortious interference with contract. Judge Lowe dismissed the retaliation and tortious interference claims, and Bennett was permitted to re-cast her complaint to allege racial and sexual harassment arising out of a hostile working environment at the prison. *Bennett v. New York City Dept. of Corrections*, 86 Civ. 4368 (MJL), slip op. (S.D.N.Y. July 10, 1987) [1987 WL 13271].

In her amended complaint, Bennett seeks declaratory and injunctive relief, compensatory and punitive damages, and lawyers' fees for violations of 42 U.S.C. § 1981 (1982), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1) (1982), based on defendants' alleged race and sex discrimination. Bennett claims also that points have been deducted from her promotional examinations because of her race and sex. Race discrimination is actionable under both Title VII and § 1981, but as Judge Lowe held, "[c]laims of sexual discrimination do not lie under § 1981." *Bennett*, slip op. at 7. Therefore, Bennett's claim for relief for sex discrimination is brought only under Title VII.

## II

■ In addition, Bennett has amended her complaint to include a claim that defendants' delay in training her to use computers was racially motivated. Her earlier motion to amend her complaint did not contain this last claim, and she has not moved to amend her complaint to include it; however, in keeping with the spirit of the Federal Rules of Civil Procedure, her complaint will be amended to include it *nunc pro tunc*. Fed.R.Civ.P. 15(a).

Permitting Bennett to amend her complaint generates another problem. Defendants assert that this court has no jurisdiction to hear Bennett's claim of race discrimination insofar as it is based on the failure to train her to use computers. Defendants reason that Bennett must first file her claim with the EEOC so that the EEOC mediation and conciliation process will be allowed to work its course and possibly resolve this issue. Defendants argue that because Bennett has not commenced an EEOC proceeding arising out of defendants' failure to train her, this court lacks jurisdiction to hear the claim. Moreover, defendants conclude that because more

than 300 days have passed since the date of the alleged discrimination, consideration of this claim by the EEOC is time barred. *See* 42 U.S.C. § 2000e–5(e) (1982).

Defendants' contentions are correct. In New York, EEOC complaints charging violations of Title VII must be filed within 300 days of their accrual or they are time barred. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982) ("filing a timely charge ... with the EEOC is ... like a statute of limitations."); 42 U.S.C. § 2000e–5(e) (1982); 29 C.F.R. §§ 1601.70–1601.80 (1988) (300–day statute of limitations applies in New York). However, there is one exception to this rule. If a plaintiff waits more than 300 days to file an EEOC charge, a district court may assume jurisdiction over the claim if and only if it is "reasonably related" to a charge timely filed with the EEOC. *Stewart v. INS*, 762 F.2d 193, 197–98 (2d Cir.1985); *Kirkland v. Buffalo Bd. of Educ.*, 622 F.2d 1066, 1068 (2d Cir.1980) (*per curiam*). A claim of discrimination is reasonably related to a charge filed with the EEOC if: a) a plaintiff presents it to the EEOC; or b) the EEOC investigates the claim; or c), the EEOC investigation of the original charge reasonably could be expected to encompass the claim. *Almendral v. New York State Office of Mental Health*, 743 F.2d 963, 967 (2d Cir.1984); *Smith v. American President Lines, Ltd.*, 571 F.2d 102, 107 n. 10 (2d Cir.1978) (citing cases); *Grant v. Morgan Guaranty Trust Co. of N.Y.*, 548 F.Supp. 1189, 1191 (S.D.N.Y.1982). Put more simply, if the initial charge before the EEOC did not apprise the defendant that the claim in question would be subject to the EEOC's inquiry, then that claim is not reasonably related to the EEOC charge. *Fitch v. R.J. Reynolds Tobacco*, 678 F.Supp. 1046, 1049 (S.D.N.Y.1987).

In the present case, Bennett's two EEOC complaints are identical in all relevant respects. In both complaints, Bennett alleges race and sex discrimination based in relevant part on "sexual harassment, in that [she was] subjected to unwelcome sexual advances, requests for sexual favors and other verbal and physical conduct."

Affidavit of Norma A. Cote (Cote Affidavit) Exhibits A and B. However, Bennett's claim regarding computer training was not brought before or investigated by the EEOC. In fact, Bennett has never filed a charge with the EEOC based on defendants' failure to train her. Moreover, because the failure-to-train claim is factually dissimilar from Bennett's charge of sexual advances, requests for sexual favors, or other harassing verbal or physical acts of sexual harassment directed at Bennett because of her race and sex, an EEOC investigation of Bennett's original charge could not reasonably be expected to encompass it. Therefore, this court lacks subject matter jurisdiction over the claim, and it will not be considered.

### III

#### A

■ Racial harassment which creates a hostile or abusive working environment violates Title VII and § 1981. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65–67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986) (Title VII); *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987) (§ 1981). In order to establish that a racially hostile atmosphere exists, Bennett ultimately must prove more than a few isolated instances of racial friction. *Snell v. County of Suffolk*, 782 F.2d 1094, 1103 (2d Cir.1986). In other words, she must show ultimately that there is "more than an episodic pattern of racial antipathy.... [T]he incidents of harassment [must] occur either in concert or with a regularity that can reasonably be termed pervasive." *S.B. Thomas, Inc.*, 831 F.2d at 1189.

#### B

Under Fed.R.Civ.P. 56(c), a trial judge must grant summary judgment if the evidence offered demonstrates that "there is no genuine issue as to any material fact and [that] the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Murray v. Xerox Corp.*, 811 F.2d 118, 121

(2d Cir.1987). The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which the movant believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 153, 90 S.Ct. 1598, 1606, 26 L.Ed.2d 142 (1970). However, once a movant meets that burden, and establishes a *prima facie* case for summary judgment, the opponent of summary judgment must adduce enough evidence to support a jury verdict in its favor. *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2510 (citing *First Nat'l Bank of Ariz. v. Cities Svc. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968)); *see* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2727 (2d ed. 1983).

In determining whether a genuine issue of material fact has been raised, not only must there be no genuine issue as to the evidentiary facts, but there must also be no controversy regarding the inferences to be drawn from them. *Donahue*, 834 F.2d at 57 (citing *Schwabenbauer v. Board of Educ.*, 667 F.2d 305, 313 (2d Cir.1981)). However, where there is nothing more than a metaphysical doubt as to the material facts, summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### C

Applying these principles here, in order to defeat defendants' summary judgment motion, Bennett need show only that there is a genuine dispute about the existence of a pattern of racial enmity in DOC generally, because such a pattern, if shown by a preponderance of the evidence, would be sufficient for a fact finder to conclude that there was a pattern of enmity directed specifically at the blacks who worked in the prison. *See S.H. Kress & Co.*, 398 U.S. at 173–74, 90 S.Ct. at 1616–17; *Ost v. Crotty,*

No. 86 Civ. 8168 (MBM), slip op. at 9–11 (S.D.N.Y. January 20, 1989) [1989 WL 4490].

Bennett's evidence, however, consists of one incident. On December 23, 1983, Bennett's colleague, Corrections Officer Dean Messina, sought to pass through a gate where Bennett was posted. He called to her "Hey, baby, on the gate," and "Hey, lover, on the gate," but Bennett refused to open the gate, saying that she wanted Messina to call her Officer Bennett or Ms. Bennett. Enraged, Messina yelled profanities to Bennett that included "hey black bitch, open the ... gate." Messina was reprimanded almost immediately by a supervisor, Captain Gumbs, who called the outburst "unnecessary and totally uncalled for." In addition, Messina ultimately was docked two days' pay for the incident.

This evidence, even when seen by a fact finder who draws all reasonable inferences in favor of Bennett, does not amount to more than a mere episodic event of racial antipathy. Officer Messina's language was deplorable, but it is evidence of nothing more than one isolated incident of racial animus. Therefore, Bennett's evidence is insufficient to sustain a claim of a racially hostile working environment. Accordingly, Bennett's Title VII and § 1981 claims arising out of a racially discriminatory working environment are without merit, and summary judgment dismissing these claims will be granted.

### D

Bennett has failed to come forward with any evidence to support her claim that points have been deducted from her civil service examination scores, and therefore this claim has not been considered, either as a part of the racial or sexual harassment claims, or as a separate incident of disparate treatment. Moreover, Bennett has not argued that the incidents of alleged sexual harassment are probative of her racial harassment claim. *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1415 (10th Cir. 1987). Therefore, that issue will not be considered here.

IV

A

Turning to Bennett's sex discrimination claim, just as with race, harassment based on sex which creates a hostile or abusive working environment violates Title VII. *Vinson*, 477 U.S. at 65–67, 106 S.Ct. at 2405–06. Moreover, in order to state a claim for sexual harassment under Title VII, Bennett must show that: (1) she was a member of a protected class; (2) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature; (3) the harassment was based on Bennett's sex; (4) the harassment was so severe and pervasive that it altered a "term, condition, or privilege" of employment and created an abusive working environment; and (5) there exists *respondeat superior* liability. *Vinson*, 477 U.S. at 67, 106 S.Ct. at 2406 (elements 4 & 5); *Rabidue v. Osceola Ref. Co.*, 805 F.2d 611, 619–20 (6th Cir.) (elements 1, 2 & 3), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 823 (1987); *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982) (elements 1, 2 & 3); 20 C.F.R. § 1604.11(a) (1988) (defining unwelcome sexual harassment); *see Vinson*, 477 U.S. at 65, 106 S.Ct. at 2406 (courts and litigants may refer to the EEOC interpretation of Title VII for guidance on the statute's meaning); *Osceola Ref. Co.*, 805 F.2d at 619 (element 5); *Katz v. Dole*, 709 F.2d 251, 254 (4th Cir.1983) (element 5); *Henson*, 682 F.2d at 903–05 (element 5). Moreover, in order to determine whether such evidence exists, courts are directed to look at the totality of the circumstances. *Snell*, 782 F.2d at 1103 (quoting *Henson*, 682 F.2d at 904); *see Gates Rubber Co.*, 833 F.2d at 1415 (citing *McKinney v. Dole*, 765 F.2d 1129 (D.C.Cir.1985)) (a broad view of what constitutes evidence of harassment ought to be employed).

Once all of the circumstances are determined, if the evidence would lead a reasonable person in a similar environment under similar circumstances to find the environment offensive, then liability should attach under Title VII. *Osceola Ref. Co.*, 805 F.2d 611, 620; *but see Barbetta v. Chemlawn Servs. Corp.*, 669 F.Supp. 569, 573 n. 2 (W.D.N.Y.1987) (citing *Osceola Ref. Co.*, 805 F.2d at 627 (Keith, J., concurring in part, dissenting in part) for a reasonable victim standard); Note, Sexual Harassment Claims of Abusive Work Environment Under Title VII, 97 Harv. L.Rev. 1449, 1459 (1984).

B

■ Turning to the merits, the parties dispute whether Bennett's proof establishes issues of fact relating to the second, fourth, and fifth elements a sexual harassment claim. Specifically, defendants assert that Bennett has not adduced sufficient evidence of these elements of her claim to survive a motion for summary judgment.

The record, seen in the light most favorable to Bennett, reveals the following incidents. In addition to the incident in which Messina called Bennett a "bitch," on September 23, 1982, Bennett was working at the Anna M. Kross Center when she encountered obscene graffiti about her. The day Bennett reported the graffiti, a prisoner was ordered to repaint the wall.

As further evidence that her work environment was oppressive, Bennett relates that Corrections Officer Robert Lora, her colleague, repeatedly asked her to go out on dates with him, but she refused. On October 5, 1983, after her shift had ended, Bennett was driving away from the prison when she noticed that Lora was following her in his car. Bennett pulled off to the side of the road, hoping that Lora would pass. Instead, he slowed down, pulled his car off to the side, and got out. Lora then walked toward Bennett's car. In the exchange that ensued, Lora asked Bennett where she was going. Bennett told Lora that it was none of his business, and immediately drove away. The next day, Bennett complained to Assistant Deputy Warden Hall about Officer Lora's conduct, and Lora never bothered Bennett again.

Less than four weeks later, on October 31, 1983, Bennett walked into a room where Captain Donovan was talking with another Captain about Donovan's sexual

encounter with a prostitute. Disgusted, Bennett walked out after hearing a portion of the story. Bennett did not report the incident to her superiors until January 27, 1984. When she did, she declined to give the names of Donovan or of the other, still unidentified supervisor.

The next day, on November 1, 1983, Bennett was beginning her shift when Captain Hynard asked if anyone wanted to be "stuck for the night." In the argot of corrections officers, the term is used to denote working overtime. However, this time, Hynard said it three times, looking each time directly at Bennett, prompting the men on the shift to burst out laughing. Bennett interpreted the remark to carry sexual import, with Hynard's question really meaning "who wants to have sex?" Bennett again did not report the incident until January 27, 1984, and did not divulge Hynard's name.

On December 17, 1983, Bennett was assigned to operate an elevator in the prison. Donovan got in, and asked to be taken to another floor. The elevator malfunctioned, taking both Bennett and Donovan to the seventh floor of the prison. Donovan said to Bennett "Hey baby, what you got in mind?" to which she replied "absolutely nothing with you." Eventually, Bennett regained control of the elevator, and took Donovan to the right floor. As with many of the other incidents, Bennett did not report the incident until January 27, 1984, and again she did not report that it was Donovan who made the remark.

In late December, someone wrote sexually explicit graffiti on the walls of the prison's corridors. The graffiti was about Bennett and two other women employees at the prison. Prisoners pass through the hall where the graffiti was written, but they are always escorted by guards, and therefore it is reasonable to conclude that a prisoner did not write the graffiti. In any event, two or possibly three days after that incident was reported, the graffiti was removed, and a memorandum from the warden instituted a new policy for monitoring and eradicating graffiti.

Further, Bennett shows that sometime between September 1983 and February 1984, on an indeterminate date, she was arriving at her post in the control room when she met Deputy Warden Hand sitting in a chair in front of the video screens she was supposed to monitor. Hand asked her to sit in his lap, and she refused. Rebuffed, Hand got up from the chair and left.

Bennett's encounters with her superiors have not been limited to her working hours. Once, when she and Captain McLaughlin were both at the same bowling alley, he smacked her on her buttocks, prompting Bennett to hit him smartly.

Bennett also asserts that a colleague of hers received a letter warning him not to associate with her. However, Bennett has not adduced any evidence about the letter, including evidence of its very existence. Therefore, the letter and its asserted contents will not be considered when evaluating Bennett's hostile environment sex discrimination claim. In addition, no probative weight will be given to the prison showing an R-rated Spanish-language movie to the prisoners. The movie included scenes of nude women, but Bennett has conceded that she attends movies that carry an R rating. Therefore, any possibility of offensiveness to Bennett seems attenuated. Moreover, even when seen in the light most favorable to the plaintiff, a finder of fact could only conclude that the movie was shown either in response to a prisoner request, or by prison officials who were attempting to maintain morale among the inmates. Showing an R-rated movie for either of these reasons is certainly permissible, and should not form the basis for Title VII liability. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, ——, 107 S.Ct. 2400, 2405–06, 96 L.Ed.2d 282 (1987) (prison administration); *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (right to view obscenity). Of course, if Bennett had adduced evidence that the prison showed the movie in an attempt to harass her or other women, the movie might be considered differently.

Looking at all of the competent evidence in the light most favorable to Bennett, from September 1983 to January 1984, there were nine separate incidents which created or promoted an atmosphere hostile to women. Although some of the incidents seem to be of little probative value, as a whole, a finder of fact who draws all reasonable inferences in Bennett's favor could conclude that they show a pattern of something beyond the occasional crude joke, trivial remark, or accidental slip of the tongue. *Downes v. F.A.A.*, 775 F.2d 288, 93 (Fed.Cir.1985) (occasional, isolated, or trivial sexual remarks cannot sustain a sexual harassment claim); *see Snell*, 782 F.2d at 1103 ("[c]asual comments, or accidental or sporadic conversation," cannot sustain a racial harassment claim); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1257 (8th Cir.1981) (comments that are "merely ... casual ... accidental, or ... sporadic" cannot sustain a racial harassment claim). Instead, a finder of fact looking at the totality of the circumstances and drawing all reasonable inferences in favor of Bennett could conclude that from a reasonable person's point of view, Bennett was subjected to a barrage of unwanted verbal and physical attention which created an abusive working environment for women. *See Snell*, 782 F.2d at 1103; *Katz*, 709 F.2d at 254 (Title VII claim may be sustained where plaintiff was victimized by extremely vulgar and offensive sexual epithets, and where her place of work was filled with sexual slur, insult, and innuendo). As this Circuit observed in *Snell*, 782 F.2d at 1103, prisons are "coarse and rowdy" institutions where conditions are "harsh and sometimes brutal," *Id.* at 1104, and where slurs are "often difficult to control," *Id.* at 1096, but that does not mean that anything goes, particularly among those who are charged with maintaining the discipline of the staff. As *Snell* itself teaches, there are limits beyond which the atmosphere even in a prison may not be allowed to deteriorate. 782 F.2d at 1103. A finder of fact looking at the evidence presented by Bennett and drawing all reasonable inferences in Bennett's favor could conclude that defendants allowed deterioration beyond these limits,

and therefore, an issue of fact exists as to this element of Bennett's claim. Although much of this evidence may not withstand closer examination at a full trial on the merits, it is more than sufficient to defeat a motion for summary judgment.

### C

■ Defendants claim also that even if Bennett worked in a hostile working environment, she has not adduced evidence that the hostility harmed her in any way. Therefore, they seek summary judgment dismissing Bennett's claim, asserting that the failure to adduce evidence of harm extinguishes her claim.

Defendants argue that in order to show the fourth element of her sexual harassment cause of action, Bennett must prove that "the ... harassment had the effect of unreasonably interfering with [her] work performance and creating an intimidating, hostile, or offensive working environment that affected seriously [her psychological well being]." *Osceola Ref. Co.*, 805 F.2d at 619; *see Downes*, 775 F.2d at 292–93. Defendants urge that because Bennett cannot show that her working environment interfered with her performance on the job, or that her psychological health was affected by the harassment, her claim must be dismissed.

When the *Vinson* court describes the fourth element of a hostile environment sexual harassment claim, it approves of *Henson*'s holding that "[f]or sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment, and create an abusive working environment.'" 477 U.S. at 67, 106 S.Ct. at 2406 (citing 682 F.2d at 904). Defendants would read the phrase "alter ... conditions of employment, and create an abusive working environment" to describe two elements: (1) altered conditions of employment, and (2) abusive working environment. In view of the Supreme Court's apparent endorsement in *Vinson* of the proposition that "Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult,"

477 U.S. at 65, 106 S.Ct. at 2405, and its discussion of hostile environment generally, 477 U.S. at 64–67, 106 S.Ct. at 2404–06, I read the quoted phrase from *Vinson*—"alter ... conditions of employment, and create an abusive working environment"—as a single element, stated in what is referred to in rhetoric as a hendiadys, the expression of a single idea using two phrases connected by "and." Thus, in order to satisfy this requirement of *Vinson*, Bennett need show only that the discriminatory hostility was sufficiently pervasive to change the work atmosphere, rather than being merely episodic, and thereby to change also a condition of employment.

To be sure, the cumulative effect of the incidents on Bennett, if any, may be some evidence tending to show whether or not they were pervasive. Looking at the evidence in the light most favorable to Bennett, some of the incidents of harassment reduced her to tears, and others left her shaking. Although Bennett often said that she did not let an individual incident affect her job performance, and although she could not remember any of the names of the psychiatrists who treated her, that failure of Bennett's evidence simply forecloses a few avenues of compensation; but it does not bar her claim.

### D

■ Defendants also assert that there is no genuine issue as to their liability for whatever damage Bennett suffered. They assert that they did not know and should not have known that Bennett was being harassed. In addition, they assert that when Bennett complained to them about the incidents of sexual harassment, they reacted swiftly, effectively, and reasonably both to redress the individual incidents, and to enforce a workable anti-harassment policy. *See Snell*, 782 F.2d at 1104 (quoting *DeGrace v. Rumsfeld*, 614 F.2d 796, 805 (1st Cir.1980)). They therefore conclude that they are not liable to Bennett for damages based she suffered as a result of her work environment, and seek to dismiss her sexual harassment claim on these grounds.

As an initial matter, the standard for employer liability articulated in *Snell* may no longer be good law. In *Vinson*, decided after *Snell*, the Supreme Court declined "the parties' invitation to issue a definitive rule on employer liability, but [agreed] ... that Congress wanted courts to look to agency principles for guidance in this area." 477 U.S. at 72, 106 S.Ct. at 2408.

Applying *Vinson* to the present motion for summary judgment, defendants would have to assert that there is no genuine issue regarding their liability as principals. However, defendants do not even address the agency issues in their motion papers. Moreover, the evidence suggests that Bennett's superiors not only knew that there was a sexually hostile atmosphere in the prison, but actually contributed to it. For example, one of the alleged harassers is a Deputy Warden, and three are Captains. Therefore, summary judgment may be denied on these bases alone.

However, even if *Snell* is still good law, summary judgment should be denied because there remain genuine issues of material fact on whether defendants have met the *Snell* standard of exoneration. The evidence suggests that defendants occasionally reacted swiftly and decisively after hearing Bennett's reports of sexual harassment. For example, the graffiti at the Anna M. Kross Center was painted over the day it was reported; the graffiti at the prison was painted over within two or three days after Bennett alerted her superiors about it, and a memorandum instituting new anti-graffiti policies was also promulgated very soon after Bennett spoke to her superiors; Messina was promptly reprimanded for his tirade and sometime thereafter was formally disciplined and docked two days' pay; and three days after prison officials interviewed Bennett, Warden Cunningham both issued an order forbidding sexual harassment and instituted classes to educate the prison staff about the issue.

However, the record reflects also that Bennett's memorandum dated December 23, was intended "formally [to] put the [DOC] on notice that steps should be taken

to erase the harassment of female officers, specifically because such harassment is getting worse when conditions should be [improving]." Cote Affidavit Exhibit F, at 3. Despite this plea for help, Bennett waited four weeks before prison officials spoke to her about the subject. Moreover, there is no indication that anyone besides Messina was spoken to or reprimanded for his participation in any of the harassing activities Bennett alleges. Therefore, when seen by a trier of fact who draws all reasonable inferences in favor of Bennett, there is some evidence that prison officials did not react swiftly and effectively to quell sexual harassment brought to their attention by Bennett, and that they did not take reasonable measures to enforce workable anti-harassment policies with enough speed. Bennett's evidence may not withstand examination at a full-fledged trial, but if it does it is strong enough to sustain a jury verdict in her favor. Therefore, summary judgment should be denied for this reason as well.

Although Bennett's claim survives summary judgment, her own deposition testimony reveals that the incidents of harassment occurred much more infrequently after February 1984, when the prison promulgated its harassment policy. Therefore, Bennett seems to concede that, at most, the hostile environment existed from August 31, 1983, the date she began working for the prison, to February 1984, when the harassing atmosphere was dispelled. Moreover, as indicated above, if *Snell* controls the outcome of this case, defendants' liability may be further lessened by Bennett's failure to tell defendants about the incidents until December 1983 and January 1984.

SO ORDERED.