**Kathryn D. BABCOCK, Plaintiff,**

**v.**

**Postmaster General Anthony FRANK, Anthony P. Musso and Robert Corcoran, Defendants.**

Nos. 89 Civ. 1479 (RWS), 91 Civ. 6886 (RWS).

United States District Court, S.D. New York.

Feb. 7, 1992.

See also, 729 F.Supp. 279.

Schwartz, Gutstein & Associates, New York City, for plaintiff (John A. Aretakis, of counsel).

Otto G. Obermaier, U.S. Atty., S.D.N.Y., New York City, for defendants (Lisa A. Jonas, Asst. U.S. Atty., of counsel).

## OPINION

SWEET, District Judge.

This Title VII action brought by plaintiff Kathryn D. Babcock ("Babcock") against defendant Postmaster General Anthony Frank (the "USPS" or the "Service") was tried before the Court from October 23 to 29, 1991. Post-trial submissions were completed on December 23, 1991. Upon all the proceedings, the following findings and conclusions were reached upon which judgment will be entered dismissing the complaint.

Babcock, an attractive, intelligent woman, thirty-seven years old, was indeed the victim of sexual harassment by her immediate superior, Anthony Musso ("Musso"). The Service responded to her complaint appropriately, however, as it did to each of her complaints that alleged sexual discrimination. This record demonstrates that not every action taken by management, perceived as adverse by the employee, can be explained by a claim of an environment hostile to women or of retaliation for asserting claims of sexual harassment.

The events of 1988 and 1989 unquestionably affected Babcock's career at the Service and undoubtedly created stress and anxiety for her. The determination of what caused these events is the subject matter of this action, and requires the fact finder to become a post-event chronicler of the activities of the USPS Management Section Center (the "MSC") at Poughkeepsie, New York.

*The Facts*

Babcock, divorced with a son now four-teen years old, was first employed by the USPS in 1981. She started out as a clerk typist and progressed through Service's merit system until reaching the position of Postal Operations Associate ("POA"). During the period in question, the MSC unit in which Babcock was involved had between six and seven employees. Musso, a Postal Operation Specialist Senior Level ("POSS"), was Babcock's direct supervisor.

Babcock and Musso had an intimate physical relationship from December 1986 to the summer of 1988. The relationship developed to the point that by July of 1988 it was Babcock's expectation, based upon Musso's representation, that Musso intend-ed to leave his wife and live with her. Musso's failure to do so was unfortunately a critical event in Babcock's career and her perception of that career.

During her employment with the USPS, Babcock filed a number of sexual harass-ment charges. The first arose out of an episode that occurred on April 15, 1988. That day, Matt Haishun ("Haishun"), a male employee subordinate to Babcock, threw a box of pencils at her. According to Babcock, when she asked Haishun to pick up the pencils, Haishun told her to "pick the goddamn pencils up yourself." The incident was investigated by both Ta-sula Williams and Robert Smith ("Smith"), the Director of Human Resources at MSC Poughkeepsie, who questioned Haishun, Babcock and Larry Green, a co-worker. Haishun claimed he had merely tossed the pencils to the floor. The only other wit-ness, Larry Green, heard but did not see the incident. Haishun was reprimanded and transferred out of the Engineering and Technical Unit ("ETU"), the unit in which Babcock worked. The ETU at the time had three employees.

On April 21, 1988, Babcock called the Wappingers Falls Police and lodged a com-plaint against Haishun. The same day, Babcock also called the Postal Service In-vestigators regarding the Haishun incident. The Postal Service Investigators com-menced an investigation. On April 24,

1988, Babcock filed a complaint with the Equal Employment Opportunity Commis-sion ("EEO Complaint") alleging she was subjected to sexual harassment by the USPS arising out of the Haishun incident. On April 25, 1988, an anonymous note, stating that Babcock ought to wear a hair-piece, was left on Babcock's desk. Later, Rudy Travali ("Travali"), another employ-ee, confessed to writing the note. Travali received a Letter of Warning ("LOW") and was recommended for training to improve his behavior.

On April 26, 1988, Babcock sought pro-tection from Haishun by the state troopers, even though she was aware that the Postal Service Investigators were looking into the incident. Under Postal Service policy, out-side authorities should not be summoned unless the employee believes that she is in imminent danger, a policy reissued at least once a year and published in the local post-al newspaper.

In the absence of any immediate danger, Babcock received a LOW for calling in the state troopers. Although Haishun had been transferred out of the ETU, he was still employed in the same facility where Babcock worked. To separate Babcock and Haishun, Babcock was temporarily as-signed to the office of field operations, another postal facility. Babcock, rather than Haishun, was transferred to the other facility because Haishun is confined to a wheelchair.

Babcock appealed the LOW to Smith on September 24, 1988, and he upheld it. Sub-sequently, the LOW Babcock received as a result of calling in the state troopers was purged from her personnel file in settle-ment of her grievance.

On October 4, 1988, Babcock filed a sec-ond EEO Complaint alleging sexual harass-ment by Musso. Babcock had originally met Musso in 1985, and he became her immediate supervisor in 1986. Babcock and Musso entered into their consensual sexual relationship sometime "around the holidays in 1986." Musso and Babcock first broke off the relationship in April 1988. After the April break-up, Musso threatened her. According to Babcock,

Musso warned her that, "[i]f I [Babcock] opened my mouth, I would lose my job, because I was having an affair with my supervisor, meaning him." After this threat, Babcock resumed her relationship with Musso and expected Musso to move in with her over the July 4, 1988, holiday weekend. There were other attempted break-ups, however, and they finally ended the relationship on July 4, 1988.

Upon Babcock's return to the ETU on or about September 6, 1988, following her temporary duty elsewhere, Musso tried to persuade Babcock to resume the relationship, telling Babcock that he loved her and could not live without her. When she refused to resume the relationship with Musso, Musso threatened to destroy her career.

On September 19, 1988, after discussing the procedure for doing so with Robert Corcoran ("Corcoran"), Acting Manager of the ETU, Musso issued Babcock a "Letter of Warning in Lieu of a Fourteen Day Suspension" predicated on an alleged act of insubordination. Corcoran was Musso's supervisor.

Babcock wrote to Smith about the LOW from Musso and explained that Musso had fabricated the act of insubordination. Immediately after Babcock complained to Smith of Musso's action, Smith initiated an investigation and spoke to Musso, Green and Vogt, a co-worker, all of whom had witnessed Babcock's alleged act of insubordination and none of whom substantiated Musso's story. Smith also learned from Babcock herself that she had had affairs with other Postal Service employees in addition to Musso.

On September 29, 1988, Babcock wrote to Peter Morrissey, Director, Operations Services, and Corcoran requesting that either she or Musso be transferred out of the ETU. In response to her request, Corcoran decided to transfer Babcock to a position that would both separate Babcock and Musso and provide Babcock an opportunity to enhance her employment credentials. He proposed a transfer into an Officer–In–Charge ("OIC") position, an assignment Babcock had requested prior to the Musso incident. However, Babcock was not trans-ferred to the OIC position because Musso left the ETU on sick leave. On October 20, 1988, Babcock met with her own counsel to discuss the remedies available to her.

On October 24, 1988, the Postal Service issued a notice of proposed removal (i.e., termination) to Musso. Smith cancelled the LOW issued by Musso and had it stricken from Babcock's file and informed Musso that, pending confirmation of the proposed removal, he would be transferred out of the ETU. Because Musso was on unpaid sick leave, the interim transfer was never effectuated. The proposed removal was confirmed by a final decision issued on December 5, 1988.

Musso appealed the termination of his employment to the Merit Systems Protection Board ("MSPB"). He settled his appeal on June 28, 1989, by agreeing to a three-grade demotion in lieu of removal and assignment to another facility. The settlement further provided that Musso was to receive no pay for the period December 17, 1988, through July 3, 1989, the period during which he was on suspension.

Two days after Musso's proposed removal from the POSS position, on October 26, 1988, Babcock asked Corcoran to promote her to Musso's position as Acting POSS. Corcoran had performed a mid-year evaluation of Babcock in August 1988. He had worked with Babcock only for a couple of months prior to this, so he consulted with Babcock's previous supervisor in preparing the evaluation. Corcoran's final evaluation stated that Babcock's work was only satisfactory, and Corcoran did not believe that Babcock was qualified for the promotion. According to the job description for the POSS, the employee must have extensive mail processing experience. Babcock's course work, computer knowledge and experience at performing POSKED studies did not fulfill this requirement. Donna Simmons was chosen by Corcoran to be the Acting POSS instead of Babcock. Simmons had been employed with the Postal Service for approximately ten years and had obtained extensive experience in mail processing.

On October 27, 1988, Babcock wrote to Morrissey and complained that Corcoran was retaliating against her for having filed the complaint against Musso by refusing to promote her to the position of Acting POSS. Morrissey also told Babcock she "was not qualified" for the Acting POSS position.

On November 14, 1988, Robert DeEttore, the POSS, was detailed into the position of Acting Industrial Engineer ("IE") at the MSC facility. Thus DeEttore was one of Babcock's supervisors from that date until she left the Postal Service. Two days after DeEttore became Acting IE, Babcock approached DeEttore and requested that she replace Simmons as Acting POSS. DeEttore told Babcock that he could not put her in Simmons' position because he was not familiar with either Simmons' or Babcock's qualifications. Furthermore, DeEttore did not want to second-guess Corcoran. Simmons remained as Acting POSS for approximately one year.

According to DeEttore the difference between the POA position, which Babcock held, and the POSS position that she wanted is that the POSS requires "extensive experience in mail processing." DeEttore noted that while Babcock had extensive knowledge of computers, the mail processing experience she lacked was a more important requirement for the POSS position. Simmons was more qualified for the position of Acting POSS because she had mail processing experience and was able to attain a knowledge of computers on the job.

It can also be inferred that these personnel decisions were taken against the background of the turmoil created in the unit as a result of Babcock's complaint and Musso's consequent termination and appeal. Though the POSS post was temporarily vacant, Musso's entitlement to it remained unresolved. Even if Babcock had established clear qualification to the post, which she did not, it would have been appropriate for the USPS to consider the temporary nature of the vacancy, the unresolved status of Musso's appeal and Babcock's complaint, and the need to stabilize the leadership of the office. The USPS did not retaliate against Babcock by appointing Simmons temporarily to the Musso post instead of promoting Babcock. There was perforce a connection between the vacancy and Babcock's complaint, but there is no evidence of any discriminatory animus in the failure to promote. Indeed, the USPS was committed to the position espoused by Babcock's EEO Complaint against Musso.

On December 13, 1988, Babcock filed a third EEO Complaint, alleging she had been subject to reprisal. This complaint was rejected by the Service upon the filing of a civil action by Babcock. The alleged reprisal consisted of not being given the opportunity to be detailed into the Postal Operations Specialist Senior ("POSS") position from which Musso had been removed because of the sexual harassment incident.

Babcock became increasingly concerned about her perceived treatment by personnel in the office. She was not invited to a party during the Christmas season and sought counselling from a social worker in the latter part of January 1989, attending three such sessions. Symptoms of stress were noted arising out of the work place, according to Babcock. It was suggested that these symptoms might be relieved by taking time off.

DeEttore, in his February 23, 1989, evaluation of Babcock's work performance, stated that he had reservations about her performance because she was using an inordinate amount of sick time. His overall evaluation of Babcock was that she performed her duties well.

In March 1989, Babcock requested a transfer from the ETU on the following conditions: (1) she would work the same hours; (2) any increased travel time would be paid for by the Service; and (3) the position could not be at a lower level than the POA position she then held—for example, she did not want a position as an OIC. Although he tried, DeEttore was unable to find her a position meeting those conditions because there were no supervisory positions available that had a tour of duty covering only the hours of 8:00 a.m. to 5:00 p.m. DeEttore did find Babcock a possible position outside the ETU, but the hours of

the position were from 11:00 p.m. to 7:00 a.m. Babcock claimed that, as a single mother of one child, she could not handle such a shift.

Also in March 1989, Babcock told DeEttore that she was having a drink at night to help her fall asleep. In an attempt to assist Babcock with this problem and her frequent absences from work, DeEttore referred Babcock to a counselor. However, DeEttore specifically stated that he was not accusing Babcock of having a "drinking problem." On April 28, 1989, DeEttore placed Babcock on restricted sick leave, which required that she obtain medical documentation for any sick leave taken. Babcock had taken 180 hours of sick leave in a three-month period.

Babcock wrote to Smith complaining that this action was retaliatory and malicious. Smith informed Babcock that a sick leave restriction was an administrative measure and was not considered an adverse action. DeEttore also told Babcock that restricted sick leave was not a disciplinary measure.

On June 13, 1989, Babcock filed a fourth EEO Complaint alleging reprisals by her supervisors, which was rejected upon the filing of this action. She claims she was penalized for taking sick leave when she needed to do so in order to attend therapy sessions for the harassment she suffered.

Babcock's attendance improved dramatically after she was put on restricted sick leave, and her sick leave restriction was rescinded on July 28, 1989. After the sick leave restriction was rescinded, however, Babcock's absenteeism increased dramatically. She used 172 hours of sick leave in only two and one-half months. During part of the time she was out on sick leave, she worked elsewhere as a teacher.

In April 1989, Babcock was detailed to the Monticello Postal Facility. Babcock complained to DeEttore that she was physically and verbally harassed there by male managers. The verbal harassment was alleged to be the following statement: "Don't say anything around Miss Babcock, because she'll file an EEO at the drop of a hat."

DeEttore interviewed the male managers Babcock had worked with at Monticello. All of them denied in writing making this comment. On the basis of this investigation, DeEttore concluded that Babcock's statements were false and issued a LOW to Babcock for making a false report. He believed that she had falsely reported the incident. DeEttore later rescinded the LOW in response to Babcock's request to reconsider and stated that he did not wish to deter Babcock from reporting sexual harassment, although at the same time he sought to eliminate false accusations.

Babcock refused to name the employee that she claimed had physically harassed her at Monticello. DeEttore was, therefore, unable to investigate this aspect of her complaint, but he reported both complaints to the Postal Inspection Service.

Babcock also testified that while Musso was in the office, Anthony Paciullo, a supervisor and friend of Musso's, kept a picture of a half-naked woman pinned to a bulletin board and would kiss the picture. However, Adrienne Wells, a Data Collection Technician and Babcock's friend, testified that she never saw the picture nor the practice. In the absence of any contemporaneous record of complaint, and given the extent of the documentation of Babcock's other complaints, this incident is disregarded and discounted.

Babcock further testified that Corcoran called her a scorned woman. Corcoran denied the allegation. Although Corcoran admitted telling Babcock that she should not be working around men, Corcoran said that this statement was an immediate and unconsidered reaction to reading Babcock's deposition. Corcoran did, as Babcock claims, assign her the duty of measuring furniture because the ETU was moving into a new facility and all the furniture and equipment had to be measured. However, such a task was considered normal for lower-level managers, such as Babcock.

The only social contact between Corcoran and Babcock consisted of Corcoran and his wife taking Babcock and her son out for ice cream. Corcoran gave Babcock red lace underwear as a gag gift at the Christmas

party in 1986, but such joke gifts were common at the office's Christmas parties.

On October 6, 1989, DeEttore received a letter of resignation from Babcock. Prior to her resignation, disciplinary action was being considered against Babcock in the form of removal for failure to maintain regular attendance. Babcock was not aware of this action at the time she resigned.

### Conclusions of Law

### Sexual Harassment

■■■ *Quid pro quo* sexual harassment occurs when an employer (or one exercising authority delegated by the employer) expressly or impliedly makes a decision affecting an employee's job status based upon the employee's willingness or refusal to submit to sexually harassing conduct. *Carrero v. New York City Housing Authority*, 890 F.2d 569, 579 (2d Cir.1989); *Watts v. New York City Police Dept.*, 724 F.Supp. 99, 103 (S.D.N.Y.1989). "The gravamen of a *quid pro quo* claim is that a tangible job benefit or privilege is conditioned on an employee's submission to sexual blackmail and that adverse consequences follow from the employee's refusal." *Carrero*, 890 F.2d at 579; *see also Henson v. Dundee*, 682 F.2d 897, 909 (11th Cir.1982). To prevail, a plaintiff needs to show some economic injury arising from the employer's denial of a concrete employment benefit. *Watts*, 724 F.Supp. at 104 n. 3; *see, e.g., Bundy v. Jackson*, 641 F.2d 934, 953 (D.C.Cir.1981) (denial of promotion); *Henson*, 682 F.2d at 911–12 (denial of admission to training program).

■■ Babcock did not suffer a tangible job detriment as a result of her rejection of Musso's sexual advances. Moreover, the Postal Service acted promptly and appropriately when it learned of Musso's threat to harm her career for refusing his advances, which it completely and unambiguously repudiated.

On September 19, 1988, Musso issued Babcock a LOW predicated on an alleged act of insubordination. On September 22, 1988, Babcock wrote to Smith complaining of Musso's action. After an investigation, Smith issued a notice of proposed removal to Musso on October 24, 1988, which proposed terminating Musso's employment with the Postal Service within thirty days. Smith then proceeded to cancel the LOW issued by Musso to Babcock and to strike it from Babcock's personnel file. Also on October 24, 1988, Smith informed Musso that, pending the final decision on his proposed removal, Smith was going to transfer Musso out of the ETU. Musso was never transferred because he went out on unpaid sick leave. The proposed removal was confirmed on December 5, 1988.

Thus, in short, Babcock did not suffer any employment repercussions from Musso's action. The Postal Service acted swiftly in investigating the incident, removing Musso from the ETU, disciplining Musso and cancelling the LOW from Babcock's file. The effect of cancelling the LOW was to render it a nullity. Absent facts showing an actual, rather than threatened, employment decision resulting in a denial of a tangible employment benefit, Babcock cannot prove sexual harassment based on a *quid pro quo* theory. *See Watts*, 724 F.Supp. at 104.

### Retaliation

■■ To prevail in her retaliation claim, Babcock must show that she "engages in protected participation or opposition under Title VII, that the employer was aware of this activity, that the employer took adverse action against [her], and that a causal connection exists between the protected activity and the adverse action." *Sumner v. United States Postal Service*, 899 F.2d 203, 208–09 (2d Cir.1990). Babcock has claimed that her failure to be appointed by the USPS to Musso's position, made vacant by virtue of her complaint, was an act of retaliation by her male supervisors—a sort of old boy network—arising out of her complaint.

On October 27, 1988, only three days after Musso was given notice of his proposed removal, Babcock asked Corcoran to promote her to Musso's job. Corcoran, however, did not believe Babcock was qualified for such a promotion because she lacked the extensive mail processing expe-

rience required by the job description for the POSS. Morrissey and DeEttore also told Babcock she "was not qualified" for the Acting POSS position. Donna Simmons, who got the job as Acting POSS, was more qualified for the position because she had extensive mail processing experience as well as some knowledge of computers.

Babcock has failed factually to establish her qualifications for the POSS position as noted above, and relief must be denied on that ground. Even were it assumed, which it is not, that Babcock was qualified, there is no evidence that the choice of Donna Simmons was sexually motivated or that a failure to promote to this temporary position constituted retaliation.

Finally, there is no affirmative evidence to establish retaliation other than the denial itself, and any inference which might thus be derived, is offset by the circumstances surrounding the vacancy detailed above.

*Hostile Environment*

■ The following elements must be established to prove hostile environment:

(1) membership in a protected class;

(2) subjection to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature;

(3) that the harassment complained of was based upon sex;

(4) that the harassment complained of affected a term, condition or privilege of employment; and

(5) that *respondeat superior* liability attaches or that the employer did not take steps to remedy the harassment.

*Henson*, 682 F.2d at 909; *Bennett v. New York City Dept. of Corrections*, 705 F.Supp. 979, 984 (S.D.N.Y.1989); *see Porras v. Montefiore Medical Center*, 742 F.Supp. 120, 126–27 (S.D.N.Y.1990); *Watts*, 724 F.Supp. at 104–08; *Carrero v. New York City Housing Authority*, 668 F.Supp. 196, 201–02 (S.D.N.Y.1987), *aff'd in part, rev'd in part on other grounds*, 890 F.2d 569 (2d Cir.1989).

To satisfy the second element of a hostile environment claim, Babcock must establish that the offensive behavior was "sufficiently severe or pervasive 'to alter the conditions of [her] employment and create an abusive working environment.'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Henson*, 682 F.2d at 904).

■ Actionable sexual harassment must consist of more than just isolated incidents or casual comments that express harassment or hostility. *See Watts*, 724 F.Supp. at 104. Whether such conduct reaches the level of actionable sexual harassment is determined by a totality of the circumstances under a reasonable person standard. *See Meritor*, 477 U.S. at 69, 106 S.Ct. at 2406–07; *Watts*, 724 F.Supp. at 104.

■ Babcock did establish a severe or pervasive practice of sexual harassment with respect to Musso's actions. However, because Musso's LOW to Babcock was expunged from Babcock's file, this brief incident had no lasting effect. Where, as here, the claimed incidents are few in number and occurred over a short period of time, they fail to rise to a level that would create a hostile working environment. *See Lopez v. S.B. Thomas Inc.*, 831 F.2d 1184, 1189 (2d Cir.1987).

■ The other incidents that Babcock claims were sexually harassing are equally insufficient to establish a hostile working environment. Occasional or isolated utterances of offensive epithets, although repugnant, are not so pervasive as to affect the conditions of employment to a degree which violates Title VII. *See Vinson*, 477 U.S. at 67, 106 S.Ct. at 2405–06; *Watts*, 724 F.Supp. at 105.

■ The other two alleged incidents that occurred in 1988—the throwing of the pencils by Haishun and Travali's note recommending that Babcock wear a hairpiece— were isolated events that cannot be deemed severe or pervasive nor sexually derived. The episodes while Babcock was working at the Monticello were not established, nor

did Babcock name the employee who she claimed physically harassed her.

■ While the gift of red lace underwear as a gag gift at an office Christmas party does not seem amusing in retrospect, it does not rise to the level of harassment, nor was it so perceived by Babcock at the time.

■ The picture of a half-naked woman pinned to the wall of Paciullo's office may have been offensive to Babcock, but it was not observed by others and it was not the subject of any complaint, contemporaneous or otherwise.

The incidents of harassing conduct alleged by Babcock simply are not sufficient to establish a hostile working environment. At most, the above incidents were a few isolated incidents that Babcock may not rely on to prevail here, *see Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2d Cir.1986), and the Postal Service responded promptly to all of Babcock's complaints. Taken together, the absence of a hostile environment was demonstrated.

*Employer Liability*

■ In *Vinson*, the Supreme Court approached, but did not decide, the issue of employer liability. The Court rejected a rule of strict employer liability and instead suggested that courts "look to agency principles for guidance in this area." *Vinson*, 477 U.S. at 72, 106 S.Ct. at 2408; *Watts*, 724 F.Supp. at 106. The reason for doing so is "to place some limits on the acts of employees for which employers under Title VII are to be held responsible." *Vinson*, 477 U.S. at 72, 106 S.Ct. at 2408. Nevertheless, once the employer is apprised of the occurrence of such offensive behavior in the work place, Title VII imposes an affirmative duty on the employer to investigate the charges. *Snell*, 782 F.2d at 1104.

■ As described above, Smith promptly investigated Babcock's claim regarding Musso and effectuated Musso's removal from the work place. In addition, Smith cancelled the LOW issued by Musso to Babcock and struck it from Babcock's personnel file.

Both Williams and Smith investigated the Haishun and Travali incidents. Haishun, who allegedly threw pencils at Babcock which did not strike her, was reprimanded and transferred out of the ETU. Postal Service Inspectors also investigated the pencil throwing incident. Travali, who confessed to writing the note about the hairpiece, received a LOW for insubordination and was recommended for training on how to improve his behavior.

The Postal Service acted promptly in investigating and disciplining both Haishun and Travali. Even assuming that Haishun and Travali's conduct could be considered sexual harassment, the Postal Service should not be held liable, because it took reasonable and expeditious steps to remedy the situation.

The Postal Service also acted promptly and reasonably with regard to the alleged acts of harassment at the Monticello postal facility. As soon as Babcock complained to DeEttore, he conducted an investigation and reported both of these incidents to the Postal Inspection Service.

In short, upon being made aware of Babcock's complaints, the United States Postal Service " 'exhaust[ed] the field of reasonable and feasible actions' it might have taken to cleanse [Babcock's] working environment" *Watts*, 724 F.Supp. at 107 (quoting *Snell*, 782 F.2d at 1104); *Bennett*, 705 F.Supp. at 987–88. The Postal Service could not have done more and should not be held liable for Musso's conduct or for the other incidents reported by Babcock and investigated by the Service.

*Constructive Discharge*

Babcock resigned from the Postal Service on October 6, 1989. She claims that her resignation was a result of a constructive discharge forced upon her by the conditions she endured at the Postal Service.

■ "A constructive discharge occurs when the employer, rather than acting directly, 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.' " *Lopez*, 831 F.2d at 1188 (quoting *Young v. Southwestern Saving and*

*Loan Ass'n,* 509 F.2d 140, 144 (5th Cir. 1975)); *Watts,* 724 F.Supp. at 108–09.

 To prove constructive discharge, a plaintiff must show that "the working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Pena v. Brattleboro Retreat,* 702 F.2d 322, 325 (2d Cir.1983) (quoting *Alicea Rosado v. Garcia Santiago,* 562 F.2d 114, 119 (1st Cir.1977)). In addition, a plaintiff must prove that her employer deliberately acted or refrained from acting, rendering her working conditions so intolerable as to force her resignation. *Watts,* 724 F.Supp. at 109.

 Babcock claims constructive discharge on the grounds that, after she filed her complaint against Musso, her supervisors were arranging to relocate her to another facility and into a lower level position. However, in response to her request to be reassigned, Corcoran decided to transfer Babcock to an OIC position in another facility. Placing her in such a position not only would have separated Babcock from Musso, but also would have provided Babcock with the opportunity to enhance her employment credentials. Smith said that Babcock had requested such an assignment prior to the Musso incident because OIC assignments are a training device. Babcock, though, was never transferred because Musso left the ETU on sick leave. Being considered for a transfer in 1988 which she herself requested cannot amount to a retaliatory or constructive discharge of Babcock by the Postal Service in 1989.

Babcock further claims that she was penalized for using sick leave. However, the record incontrovertibly shows that Babcock did in fact use an excessive amount of sick leave. Indeed, the record shows that she used some of her sick leave to work in another job as a teacher. Moreover, according to Smith, Babcock's placement on sick leave restriction was simply an administrative measure and was not considered an adverse action. DeEttore also told Babcock that restricted sick leave was not a disciplinary device.

In sum, Babcock has not proved that her working conditions at the Postal Service were so intolerable that a reasonable person would have resigned in the same situation. Moreover, the evidence established that the Postal Service did not act deliberately in making Babcock's working conditions so intolerable that she should have felt compelled to resign.

For the foregoing reasons, judgment will be entered dismissing the second, consolidated complaint against the USPS.

It is so ordered.