**Frances DANNA, Plaintiff,**

**v.**

**NEW YORK TELEPHONE
COMPANY, Defendant.**

**No. 87 CIV. 7250 (CBM).**

United States District Court,
S.D. New York.

Nov. 17, 1990.

Louie Nikolaidis, Lewis, Greenwald, Kennedy, Lewis, Clifton & Schwartz, New York City, for plaintiff.

Ronald Burden, Saul Scheier, Lon Bannett, New York Telephone Co., New York City, for defendant.

*Findings of Fact and
Conclusions of Law.*

MOTLEY, District Judge.

Plaintiff Frances Danna brought this suit against her employer, New York Telephone Company (Telco), alleging that she was discharged and demoted because of her sex and was subjected to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Plaintiff requests injunctive relief from harassment in the performance of her duties as well as other relief in the form of reinstatement to the position of Service Technician, backpay, attorney's fees and costs.

After a bench trial and full consideration of both side's post-trial submissions and arguments, the court concludes that plaintiff has met her burden of proof in establishing a hostile environment as an independent basis for Title VII liability. She has also demonstrated that her demotion was the result of disparate treatment. In regard to her suspension, the court finds that she has failed to establish that she was the victim of illegal sex discrimination. This court hereby awards Danna reinstatement to the position of Service Technician, backpay, injunctive relief, attorney's fees and costs.

*Findings of Fact.*

1. Danna was first employed by Telco as an Operator on June 23, 1969. She held this position for approximately seven years. (Tr. 26).

2. On March 2, 1976, Danna was promoted to the position of Store Room Attendant in connection with a Telco affirmative action program. (Tr. 27, 257, 258).

3. While holding the Store Room Attendant's position, Danna submitted an Upgrade and Transfer Plan Application (UTP) requesting a promotion. (Tr. 258). Under the UTP program, employees can request a promotion, a lateral transfer or downgrade to other positions. (Tr. 258–59). To qualify for a UTP request, an employee must have had a satisfactory or outstanding job appraisal at his or her current job and must have passed the required tests for the particular job for which he or she is applying. Telco claims that UTP requests are rejected from employees who have unsatisfactory job appraisals or are on final warning. (Tr. 1142–43).

4. In April of 1977, Danna was promoted to the position of Storekeeper. (Tr. 27). She held this position for approximately three years until February 1980. (Tr. 27, 260). Danna's last job evaluation as a Storekeeper was outstanding. (Tr. 260).

5. In February 1980, pursuant to another UTP request and after passing the required test, Danna was promoted to the position of Frame Administrator. (Tr. 27, 260). In addition to passing the Frame Administrator test, Danna also passed the tests for Switch Technician and Switching Equipment Technician during the same general time period. The two later positions are higher level craft positions than Frame Administrator or Service Technician. (Tr. 29).

6. A Frame Administrator is an employee who works on the equipment in Telco's central office. The primary duties of this position include connecting and disconnecting service to individual telephone lines. (Tr. 27–28, 1064–65). Danna held the Frame Administrator position for approximately 15 months between February 1980 and May 1981. (Tr. 27, 261).

7. In each of the positions Danna held between June 1969 and May 1981, she received outstanding or satisfactory job appraisals. (Tr. 30–31). She never received an unsatisfactory appraisal. (Tr. 31).

8. In May 1981, Danna was promoted to the position of Repair Service Technician in the Public Communications Department located in Corona, Queens. (Tr. 30, 261).

9. A Repair Service Technician is a mechanic who either repairs, installs, or tests telephone equipment. (Tr. 832). Such a technician could be assigned to either routine or dispatch work. Routine work entails checking approximately 80 to 125 public telephones per day on an assigned route. (Tr. 32–33). If a technician found a telephone broken, it was his or her job to repair it. (Tr. 34). Dispatch work requires

the Repair Service to send a technician directly to phones that had been reported as out of order by a customer. (Tr. 34).

10. When Danna first became a Repair Service Technician, she was assigned to work with other employees for 3 to 4 weeks. (Tr. 31). Thereafter, she was sent to Service Technician School for approximately 3 to 5 weeks. (Tr. 31). At this Service Technician School, employees were instructed in both telephone repair and installation. Here, she received the same training as other male employees. (Tr. 261).

11. During the two-year period Danna worked as a Service Technician in the Public Communications Department, she was mostly assigned routine repair work. (Tr. 34–35). Danna asked her supervisors to assign her to more dispatch work, but her requests were rarely granted. (Tr. 35–37). She claims, however, that men were given the opportunity to do dispatch work. (Tr. 41).

12. Danna proffers two different explanations for not being assigned dispatch work. On direct examination she claimed that: "The reason they [her foremen] were keeping me on routine was because I was doing such a good job and their numbers looked great." (Tr. 37). On cross examination, she claimed that several supervisors gave her the "easier" routine work because she was a female. (Tr. 262–63). The latter explanation, however, contradicts her deposition testimony where she stated that the supervisors in question had not discriminated against her because of her sex while she was working in the Public Communications Department. (Tr. 263–64).

13. Danna also had requested during the two-year period she worked in the Public Communications Department that her supervisors ride with her on the job. The request was not honored. (Tr. 37).

14. While working in the Public Communications Department, Danna and her male co-workers, would often use profane and vulgar language. On one occasion, Danna was suspended for two and a half days for asking her supervisor, Bobby Poole, how his "blow job" was last night—literally suggesting that one of Mr. Poole's male subordinates had engaged in oral sex with him but figuratively implying that this employee was trying to curry favor with Poole. (Tr. 272–74). After the suspension, for the remainder of her employment with Telco, Danna continued to use vulgar language in the workplace. (Tr. 271, 308–09). However, she no longer directed such profanity at her supervisors. (Tr. 329).

*Danna's initial Assignment to JFK Airport—August 1983.*

15. Pursuant to another UTP request, Danna was laterally transferred to the Special Services Department at the South Queens Special Services District at John F. Kennedy Airport (JFK) in August 1983. (Tr. 41, 264). The South Queens Special Services District was responsible for repairing and installing telephone dial tones, private lines, alarms, data and television circuits to business customers. (Tr. 42).

16. Danna worked as a Service Technician in this Department at JFK Airport for approximately 2½ years until November 1986. During this entire period, she was the only female Service Technician at JFK Airport. (Tr. 34).

17. When Danna first arrived at JFK Airport, she was assigned to work with four experienced Service Technicians for approximately four weeks. (Tr. 42, 44, 265).

18. In October 1983, Danna was sent to Transmission School which she attended for four weeks. (Tr. 53). At the Transmission School, she was instructed on how to use certain meters to test telephone equipment. (Tr. 52). She received the same in-class training that the other Service Technicians received who were in her class. (Tr. 267).

19. From November 1983 to September 1984, Danna worked for foreman John Remsen. (Tr. 291–92). In the morning, she would regularly receive her first job assignment from Remsen. (Tr. 54, 291). Thereafter, she would call the Dispatch Clerks for subsequent work assignments. (Tr. 58).

20. Danna claimed that she asked her Supervisor, John Remsen, to assign her data work so that she could better utilize the training she received at Data Transmission School. (Tr. 56–57). She testified that despite her requests, Remsen continued to assign to her the less complicated dial tone work. (Tr. 56). Remsen, however, maintained that he assigned her the same mix of work as the male Service Technicians. (Tr. 1308). Danna admitted that she did not know the type of work that was routinely assigned to her male co-workers. (Tr. 65).

21. Although Remsen assigned Danna the first job of the day, Danna actually received the majority of her work assignments from the predominately female Dispatch Clerks. Through the Dispatch Clerks, Danna was ultimately assigned to do all the different types of jobs performed by technicians in Special Services. (Tr. 58–59, 292).

22. Charles Dylnicki, Danna's second line manager from August 1983 to May 1986, supervised her first line manager. From 1983 to 1984 Danna's first line manager was John Remsen. From 1984 to 1986 her first line manager was Salvatore DePetro. (Plaintiff's Exhibit 38.)

*Temporary Assignment to Barbara Esposito as Administrative Clerk.*

23. In October 1984, Barbara Hyatt Esposito was placed at JFK as an Assignment Office Supervisor. At the time of her transfer, Esposito had over twenty-five years of experience with Telco, including seventeen years as a management employee. (Tr. 426–27).

24. In November 1984, shortly after she arrived at JFK Airport, Esposito asked her second line manager Charles Dylnicki for an additional clerk to help organize the Assignment Office. (Tr. 429).

25. Dylnicki asked Danna if she wanted to work temporarily as an Administrative Clerk for a special project. (Tr. 102). Danna voluntarily accepted the clerk's position provided that she still receive her Service Technician's salary while working in the lower paying clerk position. (Tr. 357–58).

26. Dylnicki reported back to Esposito that Danna would work with her. Dylnicki at this time also told Esposito that "they [were] looking to get rid of her [Danna] ... because she was a pain in the ... ass." (Tr. 429, 505–06).

27. Esposito states that DePetro also said that Danna was a "pain in the ass" and that he too wanted to get rid of her. He further commented that Danna did not get along well with the other repairmen and if she would act more "feminine and cutesy" they would have done her work for her. (Tr. 432). DePetro, however, denied making these statements. (Tr. 1197, 1206).

28. Danna worked for Esposito as an Administrative Clerk from November 1984 through March 1985. (Tr. 105). It was extremely unusual for a Service Technician such as Danna to be temporarily loaned as an Administrative Clerk. Service Technicians were usually only loaned as Administrative Clerks to accommodate a physical disability. (Tr. 433).

29. Esposito gave Danna an excellent job evaluation for the work she did. (Plaintiff's Exhibit 12). Although the evaluation was for the work Danna performed as an Administrative Clerk and not as a Service Technician, Esposito found Danna in general to be "extremely helpful," that Danna "instituted new procedures," was "very cooperative," and "very well organized." (Tr. 430–31).

*Danna's return to Special Services; Complaints about management and co-workers: March 1985.*

30. When Danna returned to her position as a Service Technician in March 1985, Esposito gave Danna's positive evaluation to first line manager Sal DePetro. According to Esposito, DePetro was surprised at the evaluation. He surmised that Danna must work better for a woman than she would for a man. (Tr. 449–50). Esposito maintained that she did not believe that her gender had any bearing on Danna's work performance. (Tr. 450).

31. Esposito further testified that Dylnicki also believed that her excellent ap-

praisal of Danna was because Danna was working for a woman. Esposito claims that during this conversation Dylnicki called Danna a "real ball buster." (Tr. 560).

32. After Danna returned to her Service Technician position in March 1985, DePetro gave Danna a satisfactory job appraisal which stated: "I find Fran to be satisfactory in all categories. Her productivity and quality of work is good. Fran has a good attitude and a good way with customers." DePetro showed this evaluation to Danna on April 15, 1985. (Tr. 1223).

33. Despite the fact that DePetro pointed to specific work qualities in his March 1985 evaluation of Danna, he testified at trial that the only reason he gave her this evaluation was that he did not know her well enough to give her anything less than a satisfactory evaluation since she had been working as an Administrative Clerk for most of the time between October 1984 to March 1985. (Tr. 1224).

34. After March 1985, Danna began to complain to her supervisors about certain conduct and practices of her co-workers. Specifically, Danna complained that the male Service Technicians were not completing their assigned work if the job turned out to be "undesirable." Some of these "flagged" or uncompleted jobs would then be reassigned to her. (Tr. 85, 91–92).

35. On one occasion, a male Service Technician wrote Danna's work number on a trouble ticket or work order. (Tr. 66–67). The trouble ticket was for a problem located at an automobile body shop. As such, the job would be very dirty. Writing Danna's number on the ticket would result in Danna being assigned this particularly undesirable job. (Tr. 74–75). It was improper for one Service Technician to put the number of another Service Technician on a trouble ticket. (Tr. 1221). Danna maintained that DePetro knew about this incident but that he did nothing. (Tr. 98–101).

36. Although Danna believed that other Service Technicians put her number on trouble tickets a number of times, she could produce only the above example. (Tr. 302).

37. DePetro, however, testified that he could determine a "flag" job if the same trouble appeared within two days of the date the job was completed. He testified that he never had problems with "flag jobs" during the period that Danna reported to him. (Tr. 1182). DePetro also testified that Danna never complained to him about another Service Technician putting her number on a trouble ticket. Other Service Technicians, however, had complained to him that they were victims of this practice. (Tr. 1221).

38. Danna also complained to her Shop Steward that Service Technicians were deliberately causing additional troubles to create work. This practice was called "folo" (fix one, leave one). Danna believed that DePetro was aware of her complaints. (Tr. 98–100).

39. Danna believed that, in general, she was assigned by DePetro to do undesirable work in undesirable locations. (Tr. 132–35). DePetro asserted that in initially assigning a particular job to a Service Technician, it could not be determined whether the job was particularly undesirable. (Tr. 1198).

40. Danna would also ask DePetro to assign her to work with more experienced Service Technicians on occasions when they needed assistance so that she could get more job training. (Tr. 136–38).

41. Danna testified that after her initial four week assignment with other experienced Service Technicians, she also was assigned to ride with Patty Capone, Ray Coffman and most often, Freddy Lorenz. (Tr. 138, 143, 152).

42. Although Lorenz had more years on the job than Danna, she did not believe that he was more experienced or that he could teach her anything. On one occasion, Danna believed that Lorenz was using drugs on the job. He had refused to leave the job site even after they had completed their work in order to socialize with friends in that location. (Tr. 140–41). DePetro admitted that Lorenz had a drug problem but claimed he became aware of it for the first

time shortly before Lorenz was dismissed. (Tr. 1228).

43. Danna testified that on many occasions, she requested that DePetro provide her with on-the-job training by accompanying her to the job site. Although he did so only once, there were five other Service Technicians whom he never accompanied on a job. (Tr. 143–44, 1185–86).

44. Danna admitted that DePetro never refused to provide her with the assistance of another Service Technician when she needed help. (Tr. 318).

45. DePetro testified that in both May and September of 1985, he showed Danna work productivity reports and informed her that she was the only Service Technician performing below average. On both occasions he also told her that he wanted to send her back to basic repair and installation school. Danna became upset at this and refused to go. (Tr. 1187–88). Danna, however, denied that DePetro had informed her at any time in 1985 that her productivity level was poor. (Tr. 328).

46. In March 1986, DePetro gave Danna an unsatisfactory appraisal for the quantity of work completed between April 1985 and March 1986. There was some testimony that Danna apparently had the lowest productivity rate of all the Service Technicians in DePetro's group for the appraisal period. However, DePetro rated the quality of her work as satisfactory. (Defendant's Exhibit K). Schultz revealed that most of the installers at JFK Airport had more than 10 years' experience, some had 20 to 25 years' experience in installation. (Tr. 588).

### Danna's Discharge/Suspension for being off the job.

47. Danna's normal work hours were from 8:00 A.M. to 5:00 P.M. (Tr. 277). The Service Technicians were permitted a fifteen minute coffee break in the morning after completion of their first job. (Tr. 278–79). However, the common practice of Danna and other Service Technicians was to stop for their coffee or breakfast at the beginning of the workday before going to their first job. (Tr. 44–45, 1380). Schultz,

a third line manager, admitted that because of various practical considerations, "foremen had a tendency to overlook this first job directive" in regard to the morning break. (Tr. 839).

48. Both Danna and Albert Lenox, a retired Service Technician who worked for Telco for forty years, testified that it was also common practice for Service Technicians to take 30 minutes or longer on their morning break. To Lenox's knowledge, no Service Technician was ever suspended or terminated for taking an extended break. (Tr. 401, 1380–81).

49. Service Technicians were also permitted a fifteen minute break in the afternoon. On some occasions, Danna admitted to taking more than a fifteen-minute break and also extending her lunch break without her foreman's permission. (Tr. 289–91).

50. Telco issues to all of its employees a company policy booklet entitled "The Codes We Work By" ("Codes"). (Defendant's Exhibit C).

51. Page 22 of the 1985 edition of the Code prohibited the following activities:

Conducting personal activities during work time that may interfere with the employee's job.

Being away from work locations without supervisory permission.

Failing to proceed from one work location to another in a direct and expeditious manner.

Falsifying work time reports.

(Defendant's Exhibit C, at 22; Tr. 284). The code required dismissal for any employee engaging in any of the above or similar activities. (Tr. 286).

52. In May 1985, Danna and other Service Technicians received a copy of the 1985 Codes from DePetro. DePetro reviewed the Codes with Danna and her co-workers as a group. He informed them that if an employee was found off the job without supervisory permission, the employee would be subject to immediate dismissal on the first occurrence. (Tr. 284–86).

53. In 1986, Norman Schultz was the District Manager of Special Services in Queens. (Tr. 829–30).

54. On February 28, 1986, Schultz and Dylnicki were conducting a business meeting at a diner when they noticed Danna sitting in the diner. Schultz testified that they saw her at the diner from approximately 8:45 to 9:20 A.M. (Tr. 836–38). Danna admitted that she indeed spent forty to forty-five minutes at the diner that morning. (Tr. 343).

55. In response to this incident, Schultz asserted that he instructed Dylnicki to check other employees to make sure that they were not similarly extending their morning break. (Tr. 838).

56. In March 1986, Telco claimed that its supervisors observed Danna off the job without supervisory permission on four different occasions, (Tr. 1253–54), and found Danna to have falsified her time sheet. (Tr. 333, 337).

57. On March 4, 1986, DePetro found her off the job for one hour and 50 minutes. (Tr. 1249). Danna offered no explanation for being off the job on this occasion. (Tr. 340–41).

58. On March 5, 1986, Danna was in the women's lounge making a work-related phone call. Barbara Esposito saw Danna in the lounge and was concerned that perhaps Danna was sick. Danna explained to Esposito that she was on hold, on the phone, for work-related purposes. When Esposito left the women's lounge, she mentioned to DePetro that Danna was in the lounge. A day or two later, DePetro asked Esposito to make a report that Danna was in the lounge for improper purposes. Esposito testified that she refused to do so because she did not believe that it made any difference that Danna was conducting her business in the lounge as opposed to making her phone calls in the office. Esposito testified that DePetro responded to her resistance to write Danna up by saying "that one way or another he was out to get this bitch and that he needed that write up." (Tr. 450–53, 521). DePetro, however, denied making such a statement to Esposito. (Tr. 1206).

59. Also on March 5, Telco accused Danna of falsifying her time sheets. Danna claims that on the day in question, she closed out her last job at 5:30 P.M., then spent the next half-hour finishing her paperwork. On her time card, Danna noted that she concluded her day's work at 6:00. This had been Danna's general practice for quite a few years and she had never been told that closing out a job and then completing the paper work was improper (Tr. 1400–02).

60. On March 6, 1986, Telco claims that Danna was observed off the job at an airport diner for approximately forty-five minutes. Apparently Dylnicki received a phone call reporting that Danna's truck was parked outside of the airport diner. Dylnicki and DePetro drove to the diner at 3:45 P.M. and observed Danna as she left and drove back to the garage at 4:30 P.M. (Tr. 1252–53).

61. Danna offers the following explanation: On March 6, 1986, she was working unescorted in a high crime area at a school that closed at 3:30 P.M. As a safety precaution, Danna left when the school closed and proceeded to the diner to complete her work related calls. She closed out the job at 4:00 P.M. and then had coffee while she finished writing up her paper work. (Tr. 1402–06).

62. On March 7, Telco claims that Danna was again observed off the job for forty-five minutes at the same diner. (Tr. 1254–55).

63. Danna claims that on this day she was working at a bank in Richmond Hill, Queens. Since the bank closed at 3:00 P.M., Danna drove to the diner to finish making her work-related calls. (Tr. 1407–10).

64. On or about March 10, 1986, Schultz, Dylnicki and DePetro met with Danna and her union representatives, Tony Caudullo and Hank Brunjes. The purpose of the meeting was to review the incidents in which Danna's supervisors had observed her off-the-job. (Tr. 842–43).

65. Schultz claims that at the meeting he went over each incident in detail with Danna, but Danna offered no explanations or excuses for being off-the-job in violation of Telco's rules. (Tr. 843, 848–49).

**602**

66. Danna claims that she was not able to respond to the accusations at this meeting because she did not have her narrative sheets to refresh her recollection of how she had spent her time on the days in question. (Tr. 341).

67. Schultz made the decision to dismiss Danna because he believed that she had engaged in a repeated pattern of being off the job without supervisory permission and had falsified her work records. (Tr. 844–48).

68. Telco, in attempting to show that it did not unfairly discriminate against Danna because she was a woman, claimed that in 1986 it had approximately 38,000 non-management employees. (Tr. 1200). From October 1985 to May 1986, 36 employees were dismissed by Telco for violation of the "Codes We Work By." Thirty-four of the 36 employees dismissed were male. (Tr. 1286).

69. Nevertheless, with only one exception, Danna was the only Service Technician in the Special Service Department in this time period to be fired for being off the job by extending break times. (Tr. 150).

70. Dennis Shea was the other Service Technician who was fired several months before Danna. Supervisors learned that Shea was supposed to be working in Queens when he was involved in an accident with his truck in Brooklyn. Shea had falsified his time sheets on the day of his accident to hide the fact that he was off the job. (Tr. 840–42).

71. Schultz claims that Shea was fired for being off the job. He denied that Shea's accident while off-the-job was a factor in his decision to fire him. (Tr. 841).

72. Dylnicki testified that "on quite a few occasions" between 1983 and 1986, he surveilled employees to determine if they were taking unearned time off. (Tr. 622). He also testified that written reports were made of those incidents when the employee's conduct warranted it and that those reports are kept on file. (Tr. 623).

73. Telco has stipulated, however, that no reports of surveillance or discipline of Service Technicians, formal or informal, presently exist for Service Technicians working in Queens during the time period 1981–1987. (Tr. 656–57).

74. Several witnesses testified that male Service Technicians who worked for DePetro would regularly take more than the allotted time but were not disciplined. Mr. Lenox, a retired employee of 40 years, testified that employees took longer than 20 minutes for coffee and the only repercussion was being "talked to" by management. (Tr. 1380–81). Esposito testified that three or four times a week service employees would meet for lunch before 12:00 and she would also observe people extending their lunch break to as late as 1:30. (Tr. 439). She also testified that Mr. DePetro accompanied the service employees. (Tr. 439). Schultz testified that it was normal for Service Technicians to take more than one hour for lunch. (Tr. 896). Danna testified that DePetro told her that when he was a Service Technician, he would take unauthorized time off. (Tr. 149).

75. In regard to falsifying time sheets, Danna testified that she had learned of an incident where one of her male co-workers had signed his time sheet to indicate that he had finished his job at 9:00 P.M. when he had in fact left work for the day at 6:30 P.M. When Danna asked DePetro whether the Service Technician would be disciplined for falsifying his time sheet, he told her: "Don't worry about it. . . . Nothing is going to happen." (Tr. 150). DePetro testified that he never made such a statement to Danna. (Tr. 1206–07).

76. In June 1986, Danna and twenty-six other employees who were dismissed for page 22 violations of the Codes were reinstated pursuant to an agreement between Telco and the Union. (Tr. 1285–86). Dennis Shea, the only other Service Technician fired from Danna's group, was also reinstated at this time. (Tr. 846).

77. Under the Union agreement with Telco, Danna's dismissal was converted to a thirty-day suspension without back pay. She was also placed on final warning status for two years. (Tr. 344, 847).

*Danna's Return from Suspension and Assignment to Installation—June 1986 to November 1986.*

78. Upon returning in June 1986, Danna was transferred from the repair "gang" to the installation "gang" at JFK Airport. (Tr. 157–58). Although an employee who is fired and reinstated with help from the union is generally reassigned to his or her previous work gang and, despite a request to stay in repair, Danna was assigned to installation. (Tr. 158).

79. Danna testified that Schultz told her that the reason she was being transferred was that DePetro was not satisfied with her productivity in the Repair Division. Since installation did not entail as much time pressure as repair, Schultz thought that Danna would have a better opportunity to work through the day and learn the job better. (Tr. 158–59).

80. Schultz, however, testified that he did not believe that it was advisable to assign Danna back to the repair gang because she "would naturally hold a grudge against DePetro and Dylnicki" in regard to her dismissal. He testified that placing her in the installation gang would afford her a fresh start. (Tr. 850).

81. Danna admitted that Schultz' decision to put her in the installation gang was ultimately a wise one. She testified that she received more experience in the installation gang. (Tr. 178).

82. While working in installation, Danna's direct supervisor was Remsen and her second line supervisor was Frank Salamone. (Tr. 159).

83. Although the formal training was the same for repair persons and installers, Danna had no on-the-job experience as an installer prior to her assignment in June 1986. (Tr. 173).

84. For Danna's on-the-job training, Remsen assigned Danna to work with Dennis Shea. Shea was fired several months before Danna for his involvement in a motor vehicle accident while he was off the job without the permission of a supervisor. She was assigned to work with Shea because he did not have a driver's license that would permit him to drive a Telco truck. (Tr. 160, 915). Shea had fifteen years experience in installation as a Service Technician. (Tr. 1297). Shea knew his job well and worked rapidly. (Tr. 161).

85. Salamone testified it was usual for a new installer to be assigned to an experienced installer for "a week or two or three." (Tr. 1092).

86. Although Shea had the experience to give Danna on-the-job training, he would not allow Danna to do any of the work herself; he would only let her watch. (Tr. 161).

87. Barbara Esposito opined that Shea had serious personal problems such that he should not have been assigned to work with other Service Technicians. (Tr. 523–24).

88. After working together for approximately three weeks, Danna and Shea were performing a job in a store in the International Arrivals Building at JFK Airport. Danna testified that when she suggested a way to complete the job more expediously, Shea began to yell and scream at her in front of store personnel who began staring. (Tr. 162–63). Danna became very upset and rushed to phone Mr. Remson in the office. He was unavailable. (Tr. 163).

89. Danna reported the incident to Esposito, who was acting in the place of Frank Salamone. (Tr. 523). Esposito testified that "no one should be assigned to work with [Shea]," that he was "very explosive" and "known to be on drugs." (Tr. 522–23).

90. After she returned to the office and in the presence of Esposito, Danna told Remsen, "I can't go out with Dennis Shea anymore. You know, he's very wild, the way he works. He won't let me do anything, anyway. You know, he embarrassed me today." (Tr. 164). Remsen responded, "you either go out with Dennis Shea or you go out with nobody." (Tr. 165, 456, 1083). Esposito later approached Remsen on Danna's behalf and was given the same response. (Tr. 526).

91. Remsen testified that Esposito was not in the room at the time and that he spoke to Danna concerning this incident

with Shea over the telephone. Remsen testified that Danna did not tell him that Shea had screamed at her. Rather he claims that Danna only told him that she could not get along with Shea and that she no longer wanted to work with him. Remsen's reply was that she had to learn to get along with Shea as well as other employees. (Tr. 1318). Remsen denied knowing of any disability of Shea's which would prevent him from training Danna and specifically denied any knowledge of Shea's participation in a company drug rehabilitation program. He did confirm that Shea stopped working shortly after his assignment with Danna and died soon thereafter. (Tr. 1318–20). Salamone admitted hearing that Shea screamed at Danna in front of customers and that Danna had requested not to be paired with Shea. (Tr. 1082–83).

92. Danna was paired-up with Shea until mid-July 1986 when Shea left Telco. (Tr. 914–15). Shea was the only installer with whom Danna was assigned to work. (Tr. 1087).

*Danna's request for a downgrade.*

93. On June 19, 1986, six days after she had been reinstated and assigned to installation, Danna submitted a UTP request to be upgraded to the position of Test Desk Technician. (Plaintiff's Exhibit 13A; Tr. 354). On June 20, 1986 she submitted a UTP request to be upgraded to the Switching Equipment position. (Plaintiff's Exhibit 13B).

94. Danna's UTP requests to be transferred out of the position of Service Technician could not be honored because she was on a final warning and had had an unsatisfactory job appraisal in March 1986. (Tr. 167, 356, 1296).

95. On October 10, 1986, Danna was informed by Salamone that she was being assigned against her will to Distribution Services. (Tr. 175). This was Remsen's decision. (Tr. 176). Under a collective bargaining agreement with the union, Telco had the right to temporarily loan employees from one location to another. (Tr. 356). Although it was not unusual for an employee to be forced to work at a temporary assignment, Danna was the only one from the installation unit force-assigned at this time. (Tr. 175).

96. The same day that she was force-assigned to Distribution Services, Danna submitted a UTP request to be downgraded to the position of Frame Administrator. (Defendant's Exhibit A). Danna did so believing that, under the circumstances, she had a better opportunity to receive the downgrade than receive the promotion she requested in June. (Tr. 168).

97. Danna worked as a Repair Technician in Distribution Services for two weeks. (Tr. 176, 358–59). Remsen testified that Danna's foreman at Distribution Services told him that, in the future, Danna should not be sent to work in Distribution Services because she could not do the work. (Tr. 1305).

98. Upon her return to installation on October 28, 1986, Danna asked Salamone and Remsen if she could be downgraded to the Frame Administrator position. (Tr. 409–10). Salamone suggested instead that Danna accept a downgrade to the position of Administrative Clerk. (Tr. 177, 978). Danna rejected this proposal for several reasons: 1) the position of Administrative Clerk was roughly equivalent to Danna's initial position with Telco seventeen years earlier, (Tr. 180), and 2) an Administrative Clerk's salary was approximately two hundred dollars a week less than she was currently making as a Service Technician which would create a "bad financial burden" for her. (Tr. 179, 207).

99. Also at their meeting on October 28, 1986, Salamone told Danna that her productivity for the past three months had been poor. (Tr. 981). Danna testified that she did not understand this evaluation concerning her productivity. Danna thought that she was doing well and believed that management was pleased with her work. (Tr. 179). Danna testified that she thought she was improving—"becoming a good craftsman for the first time" instead of just a technician. She "was snaking ceilings, ... fishing walls [and] ... working with lots of hardware and tools that [she] never had before." (Tr. 178).

100. Danna further claimed that she neither had discussions with her supervisors concerning her productivity nor was she shown any statistics regarding her productivity before the October 1986 meeting. (Tr. 178–79). She also contended that Remsen never told her what Telco's productivity objectives were. (Tr. 1413). It was, however, Telco's policy to do so. (Tr. 462). Esposito testified that Remsen admitted to her that he never told Danna what her productivity objectives were. (Tr. 467, 528–29). Salamone stated that it would be unfair to evaluate an employee's productivity without a prior discussion of objectives. (Tr. 1110). He also said it was not unusual for new installers to fall short of their performance quotas. (Tr. 1095).

101. Salamone admitted that he never discussed Danna's poor productivity with either Danna or Remsen until October. (Tr. 1095, 1096). Remsen testified that he had discussed productivity objectives with her when she was first assigned to him in installation. (Tr. 1295–96). He testified that he told Danna in September 1986 that her productivity was below par. He claimed that Danna's response to his criticism of her productivity was to "stop wasting [her] time and give [her her] fucking downgrade." (Tr. 1301).

102. Also during this time while in installation, Danna became "paranoid" about her job. She testified that she was afraid "they still may be following me to try to fire me again or try to do something to me.... I was at the point where I didn't want to work outdoors anymore and I didn't want to drive a company vehicle." (Tr. 169). She testified that she requested the two UTP transfers in June because, in the Special Services department, "I was being surveilled. I wasn't being treated properly. I was being insulted. I was being embarrassed in public, and management allowed this conduct to continue." (Tr. 166).

103. According to a Telco Crew Performance Record which documents the average time spent per job completed for each month, Danna was consistently below average for the period between July and Octo-

ber 1986. (Defendant's Exhibit D). However, in October 1986, Danna had only three months' experience as an installer. All of the other installers had at least ten years' experience. (Tr. 460, 588).

104. Exposito testified that she thought a downgrade for Danna was premature, that Danna really "needed more help," that is, "somebody to go out with her, spend time with her" especially since, to her knowledge, Remsen had never informed Danna what the company expected of her. (Tr. 467).

105. Following a meeting on October 28, 1986, Salamone arranged to have a field foreman, Joe Guthlein, ride with Danna. He testified that he did this in an attempt to find out what roadblocks or problems Danna had in performing the job. (Tr. 1003).

106. Guthlein rode with Danna on October 28–31, 1986. Danna testified that Guthlein did not provide her with any training, did not give her any advice on how to improve her performance, and did not comment on her performance. (Tr. 188–89, 190, 194).

107. Danna maintained that she encountered no unusual problems during her rides with Guthlein, with one exception: the occasion that she forgot her security pass to admit her to a work site at JFK Airport. (Tr. 189).

108. Guthlein reported to Salamone and Schultz that Danna was anxious to get out of the Service Technician position and be downgraded to the Frame Administrator position. (Tr. 855, 857). On November 18, 1986, Guthlein gave Salamone a written report wherein he stated that he found Danna's truck unorganized and Danna "upset by orders with wrong address, no customer contact on site, bad pairs assigned, location locked and no key etc." (Plaintiff's Exhibit 14). He also wrote "It is apparent to me that Fran is now working in the wrong job. It has her confused, upset, unorganized and inhibits her ability to function to her standards and ours." (Plaintiff's Exhibit 14).

109. From November 5 to November 7, Danna was assigned to ride with Betty Sutton, a female foreman from Brooklyn,

who was requested to come to JFK Airport, in Queens, to assess Danna's performance. (Tr. 1005, 1009). Esposito testified that Sutton told her that she specifically was asked to evaluate Danna because she was a woman and thus would give the appearance of impartiality. (Tr. 477). Salamone testified that he never requested any particular person to ride with Danna but that he wanted someone who would be impartial in evaluating Danna—someone who did not know of her. (Tr. 1005–06).

110. When Salamone told Danna that Sutton would be riding with her, Danna became upset. She told him that he was wasting his time: "she didn't need Miss Sutton. She needed more field training, but, then, on the other hand, why couldn't she have a downgrade to the [Frame Administrator position]." (Tr. 1007).

111. According to Danna, Sutton told her that she did not see any problems with her performance. Sutton made no suggestions to Danna on how to do her job and did not provide any on-the-job training. (Tr. 203). Sutton did not make any notes during the rides. (Tr. 416).

112. Contrary to Danna's testimony regarding the time they spent together, Sutton wrote a letter which stated, in part, that Danna had refused to accept any training or constructive criticism and was not capable of performing the job of Service Technician. (Defendant's Exhibit B).

113. Danna testified, however, that she had read Sutton's letter prior to the trial and that the letter entered into evidence as Defendant's Exhibit B was not the same letter that she recalled reading. The original of the letter was not produced. (Tr. 419–20). Betty Sutton has since died. (Tr. 392).

114. Schultz testified that Sutton's role was not to train Danna but to "evaluate if training was required." (Tr. 932). Yet Schultz saw no evidence to suggest that Sutton took notes on her rides with Danna. (Tr. 932–33). He further testified that after Sutton verbally reported that he had better "get this employee out of the field before she hurts herself or someone else," he did not ask how she had come to this conclusion. (Tr. 934). Further, Sutton did not provide Schultz with a specific instance on which she based her opinion and he did not ask for one. (Tr. 934–35).

115. After her meeting with Salamone and Remsen on October 28, 1986, Danna improved her productivity. In October Danna's productivity improved to match the installers' objective of 4.5 hours per job. (Tr. 1013). However, Telco asserts that her average was still below the average of the group, 3.5 hours per job. (Defendant's Exhibit D).

116. On November 10, 1986, Danna was told by Salamone that she was being downgraded to the next level available in the Installment department, Administrative Clerk. (Tr. 206, 1012, 1014). Schultz testified that he made the decision to downgrade Danna to the Administrative Clerk's position for several reasons: her productivity was slipping, Danna wanted to be downgraded, and she had refused additional classroom training. (Tr. 855). He also testified that he had relied on the written and verbal reports of Guthlein and Sutton in making his decision but had relied more on the verbal reports. (Tr. 927–28).

117. Schultz testified that during his career as District Manager, he had never downgraded an employee more than one level. (Tr. 928). Schultz thought Danna would make a good senior Frame person. (Tr. 929).

118. Salamone testified that, although it was Remsen's job to train Danna, he had no knowledge whether Remsen had conducted any such training. (Tr. 598–99). He also testified that he knew Danna had requested on-the-job training and the only attempts to provide this were the rides with Guthlein and Sutton. (Tr. 599).

119. Salamone testified that for his part in the decision to downgrade Danna, he considered Danna's performance in her Special Service assignment, the written reports of Guthlein and Sutton, "Danna's desire to get out of installation," and, least significantly, feedback from Distribution Services. (Tr. 601–03).

### Danna's Downgrade to Administrative Clerk.

120. Danna was told that she was going to be downgraded on November 10, 1986. Guthlein's written report, which should have been written soon after his ride with Danna in late October, was not written until November 16, 1986. (Plaintiff's Exhibit 14; Tr. 476, 593–94). Additionally, Danna's written Non-management Performance Appraisal was not submitted to Salamone until November 13, 1986. (Plaintiff's Exhibit 3B). Management was also aware that Danna's productivity had improved the month before the decision was made to downgrade her. (Tr. 1013). No male Service Technician had ever been downgraded to this extent. (Tr. 929).

121. Esposito testified that the only circumstance in which a repair person had been substituted in a clerk's position was where the person had some sort of physical disability. (Tr. 433).

### Danna's assignment to Barbara Esposito: November 1986.

122. On November 10, 1986, Danna was assigned to work for Barbara Esposito, who was then the Dispatch Foreman. Among other things, Esposito's clerks had the responsibility of dispatching Remsen's installation crew. (Tr. 440–41).

123. Esposito testified that Remsen told her that he did not want Danna dispatching his men because she then would know how much work they were doing. (Tr. 470–71). Nevertheless, Esposito assigned Danna to dispatch Remsen's installation crew. (Tr. 223).

124. Danna received an outstanding appraisal for the work she did under Esposito. (Tr. 480). It stated that Danna was "liked and respected by her peers and management as well," she was "prompt, professional" and had been "commend[ed by] the technicians as to her ability to assist them." (Plaintiff's Exhibit 3B; Tr. 480). Esposito further testified in regard to this evaluation that Danna's organizational skills were "excellent." (Tr. 481–82).

125. In January 1987, Salamone instructed Esposito to determine the productivity levels of the installers. (Tr. 1117). Salamone testified that, to a degree, Exposito was qualified to make productivity determinations. (Tr. 1117).

126. Esposito, using computer-generated reports, determined that Danna's quantity of work compared favorably with other installers. (Tr. 442, 448, 543; Plaintiff's Exhibits 7–11).

127. Esposito testified that at this time Danna was averaging two jobs per day. (Tr. 542). In 1985–86, she found that three male installers averaged more hours per job than Danna. (Plaintiff's Exhibits 4A, 4B, 4C). Two male installers in particular had poor productivity records. (Tr. 538–41).

128. Telco claimed that there were legitimate reasons for the low productivity level of these male employees. Company representatives submitted that some were assigned non-measurable work, (Plaintiff's Exhibit 4B), some worked in areas where there were extensive cable problems, (Plaintiff's Exhibit 4A), or worked in locations outside of JFK Airport. (Plaintiff's Exhibit 4C).

129. Despite all of the studies and statistics concerning productivity levels, Salamone admitted that unless one knew the actual jobs done, a comparison of productivity between one installer and another is impossible. (Tr. 1119–20). The documents which would indicate the specific jobs completed by the installers for this time period were destroyed by Telco. (Plaintiff's Exhibit 34).

130. While Danna was working as an Administrative Clerk, Salamone was able to locate a Frame Administrator's position in the Bronx that Danna could fill. He told Danna that she could have the position. She declined because she lived in Queens and did not want to commute to the Bronx. This was the only Frame Administrator position offered to her before July 1987. (Tr. 214–15, 1017).

131. Telco presented evidence that from June 1986 to April 1988, 165 individuals, including 93 males, were placed into the position of Frame Administrator through

upgrades, downgrades, lateral transfers or as new hires in the boroughs of Manhattan, Queens, and Brooklyn. (Defendant's Exhibits G, I). These placements were UTP and non-UTP. *Id.*

132. From the period August 2, 1986 to December 16, 1987 in the Borough of Queens alone, Frame Administrators performed over 64,000 hours of overtime (an average of over 900 hours per week). (Plaintiff's Exhibit 17). Schultz admitted that Queens was "desperate for people" to work as Frame Administrators in 1987—so much so that they were borrowing Administrative Clerks to perform the job. (Tr. 956). Salamone testified that Danna brought to his attention a number of Frame Administrator openings reported in Telco's newspaper. (Tr. 1008).

133. Danna's eligibility to work as a Frame Administrator was clearly demonstrated by the offer to place her as a Frame Administrator in the Bronx. (Plaintiff's Exhibit 44). Schultz and Salamone even admitted that Danna was highly qualified to work as a Senior Frame Administrator, the level above Frame Administrator. (Tr. 929, 1068). Salamone stated he knew of no one more qualified than Danna to be a Frame Administrator. (Tr. 1079).

134. An important criterion considered for upgrading or transferring a current employee to a new position within Telco is the employee's New Credited Service Date (NCSD), or date of hire, that is, all qualifications being equal, the candidate with most seniority would get the job. (Tr. 1153). Of the 93 men placed into Frame Administrator positions, only four had NCSDs earlier than Danna's. Of those four, two were downgrades, and two were lateral transfers. All males upgraded to the Frame Administrator position had less seniority than Danna. (Defendant's Exhibits H, J).

135. The job-related experience of the individual is the next most important factor. (Tr. 1153). Of the 93 males who received the Frame Administrator's job only three males had as much experience at the level of Frame Administrator as did Danna. (Defendant's Exhibits H, J).

136. In July 1987, Danna was assigned to a temporary position as a Frame Administrator. (Tr. 218–19). In February 1988, Nikloajas Maslovs, Danna's supervisor at that time, found Danna to be qualified for placement through the UTP process. (Plaintiff's Exhibit 39). In April 1988, Danna was upgraded to a Frame Administrator position. (Defendant's Exhibit G; Tr. 219). Maslovs testified that he did not know that Danna was on final warning when he found her qualified for the upgrade and that he did not contact her previous supervisors. (Tr. 1134). Up to the time of trial, Danna remained in this position.

*Hostile Environment Claim.*

137. Danna complained of incidents that were overtly sexual in nature at the Telco work place. (Tr. 112–131).

138. On one occasion while she was working in the Special Services Department, Danna called John Remsen, a supervisor, on the phone to ask if he knew where she could find a certain key. Remsen turned the phone over to a Mr. Mahon, at which time Mahon allegedly responded to her query: "You know what you need? You need a good fuck in the ass." (Tr. 128). Danna claimed she could hear others in the room with Mahon, presumably Remsen, laughing at his remark. (Tr. 127). Mahon has since been promoted to a second line supervisor. (Tr. 128).

139. Lewd graffiti directed specifically at Danna were scribbled on the walls of the terminal rooms in JFK Airport used by Telco's employees. (Tr. 112–23). This graffiti included the following:

1. "Fran Danna you ungrateful cunt you suck." (Plaintiff's Exhibit 19A, Tr. 115).

2. "Sit on Danna's face." (Plaintiff's Exhibit 19B, Tr. 115).

3. "Just when you thought it was safe to go into the airport again ... Fran Danna II." (Plaintiff's Exhibit 19C, Tr. 117).

The graffito stating "Sit on Danna's face" was written over a picture of a face with a penis in the mouth. (Tr. 123). The picture

accompanying the graffito "Just when you thought it was safe to go into the airport again ..." ostensibly depicted an act of anal sex. These graffiti were on the walls for at least two years. (Tr. 116).

140. Danna admitted that she also had written graffiti on the terminal walls but had not done so until 1986. Danna maintained that she only wrote graffiti in response to graffiti written about her. Danna claims that she did not use profanity in her graffiti and she never wrote derogatory comments. (Tr. 397).

141. Danna's supervisors were aware of the graffiti directed at Danna and with the exception of one incident, where DePetro authorized another employee to spray paint over certain graffiti concerning Danna, they did nothing to have it removed. (Tr. 911). DePetro testified that he instructed his employees to "Cut it out, I want it stopped." (Tr. 1199). Danna testified that Mr. Remsen told her, "I don't think I can do very much about it. You are probably better off not making a stink about it because ... they will do it even more." (Tr. 121). Danna noticed no decrease in the amount of graffiti directed at her. (Tr. 121). Remsen said that he knew of no rule at JFK Airport which would have prevented him from removing the graffiti and that, although he saw the graffiti, he took no action to have it removed and did not report it to any of his supervisors. (Tr. 1316).

142. Telco's company policy was that any employee who believed he or she had been discriminated against or harassed because of sex, may complain to his or her supervisor. If the employee was dissatisfied with her supervisor's response, the employee could complain to Telco's internal EEO Organization. (Tr. 320–25, Defendant's Exhibit F). Danna was aware of this policy. She complained to her supervisors but never availed herself of the internal EEO organization. (Tr. 326).

143. On November 12, 1986, Danna filed a complaint of sex discrimination with the New York State Division of Human Rights. (Plaintiff's Exhibit 1). Danna's supervisors at Telco became aware of this complaint shortly after it was filed. (Tr. 1115). On or about August 12, 1987, Danna received a Notice of her Right to Sue. Telco also received a copy. (Plaintiff's Exhibit 2).

*Conclusions of Law.*

In the present case, Danna claims that she had been a Service Technician for Telco for several years during which time she was the victim of sex discrimination and was ultimately demoted to the position of Administrative Clerk. She has asserted three distinct theories of sex discrimination under Title VII.

First, she claims that she was subjected to sexual harassment in the form of being forced to work in a hostile environment.

Second, she alleges that she was demoted because of illegal sex discrimination in violation of Title VII.

Third, she claims that she was discharged for sexually discriminatory reasons.

Title VII of the Civil Rights Act of 1964 prohibits discrimination "against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's ... sex." 42 U.S.C. § 2000e–2(a)(1).

For the reasons set forth below, Danna's sexual harassment claim is sustained. Her disparate treatment claim is sustained as to her demotion. Her discharge claim is denied.

### I. Hostile Environment.

In the present case, Danna claims that she was subjected to a hostile environment in violation of Title VII as both a breach in and of itself and as evidence relevant to her discharge and demotion claims.

The Supreme Court has recognized that a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment. *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 64–69, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49, 58–60 (1986).

To establish a claim for hostile environment, a plaintiff must prove:

(a) The employee belongs to a protected class;

(b) The employee was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature;

(c) The harassment complained of was based upon sex;

(d) The harassment complained of affected a term, condition or privilege of employment; and

(e) Respondeat superior.

*Henson v. City of Dundee,* 682 F.2d 897, 909 (11th Cir.1982); *Koster v. Chase Manhattan Bank,* 687 F.Supp. 848, 862 (S.D.N.Y.1988).

■ To be actionable, the sexual harassment must be "sufficiently severe and pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Meritor,* 477 U.S. at 67, 106 S.Ct. at 2406, 91 L.Ed.2d at 60 (quoting *Henson,* 682 F.2d at 904). Sexually harassing conduct must constitute "more than isolated or sporadic incidents". *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 301 (S.D.N.Y.1987), (quoting *Snell v. Suffolk County,* 782 F.2d 1094, 1103 (2d Cir.1986)); *see also Carrero v. New York City Housing Authority,* 890 F.2d 569, 577 (2d Cir.1989). Whether such conduct meets these requirements must be determined by a totality of the circumstances. *Meritor,* 477 U.S. at 69, 106 S.Ct.

at 2406, 91 L.Ed.2d at 61; *Carrero,* 890 F.2d at 577–78. If the evidence leads a reasonable person in a similar situation to find the environment offensive, then liability should attach under Title VII. *Bennett v. New York City Dept. of Corrections,* 705 F.Supp. 979, 984 (S.D.N.Y.1989).

### A.

■ In the instant case, Danna has proved each of the necessary elements to find Telco liable for subjecting her to a hostile environment in violation of Title VII. Danna offered evidence that she was subjected to unwelcome sexual harassment in the form of sexually explicit graffiti directed specifically at her which were displayed in various workplace locations. The graffiti remained on the walls for at least two years. Telco supervisors were aware of this graffiti but failed to take effective measures to stop the graffiti writing or to have what was already written removed. Additionally, Danna claimed that on one occasion, she was told over the phone by a fellow employee that "she needed a good fuck in the ass." (Tr. 127–28). It was Danna's belief that at least one supervisor overheard this comment.[1] The court finds this ongoing harassment severe and pervasive enough to hold Telco liable.

Telco argues that it should not be liable for subjecting Danna to a hostile work environment on a number of grounds. The

---

1. Danna has also claimed that while she worked in the Public Communications Department pornographic telephone calls were broadcast on a loudspeaker from a trailer which was exclusively accessed by supervisory personnel. This incident of sexual harassment, however, is time barred. In New York, EEOC complaints charging violations of Title VII must be filed within 300 days of their accrual. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234, 243 (1982) (filing timely charge with EEOC, as with statute of limitations, is subject to waiver, estoppel and equitable tolling). An exception to this rule occurs if a plaintiff waits more than 300 days to file an EEOC charge, a district court may assume jurisdiction over the claim only if it is "reasonably related" to a charge timely filed with the EEOC. *Stewart v. INS,* 762 F.2d 193, 197–198 (2d Cir.1985); *Bennett v. New York City Dept. of Corrections,* 705 F.Supp. 979, 982 (S.D.

N.Y.1989). A claim of discrimination is deemed to be reasonably related to a charge filed with the EEOC if: a) a plaintiff presents it to the EEOC; b) the EEOC actually investigates the claim; or c) the EEOC's investigation of the original charge could be reasonably expected to encompass the claim. *Bennett,* 705 F.Supp. at 982. *See also Almendral v. New York State Office of Mental Health,* 743 F.2d 963, 967 (2d Cir.1984). The events Danna complained of at the Public Communications Department occurred between 1981 and 1983, at least three years before she filed her claim with the EEOC. Furthermore, Danna cannot avail herself of any of the above exceptions. She did not present the claim to the EEOC, the EEOC did not in fact investigate the claim, and since the events complained of occurred at a different location than the events of the rest of her sexual harassment claim, the EEOC's investigation could not be reasonably expected to encompass the claim.

court does not find these arguments persuasive and rejects them.

First, Telco contends that the graffiti and vulgar comment made by a co-worker, even if credited, were not sufficiently severe and pervasive under the standards this court adopted in *Christoforou v. Ryder Truck Rental, Inc.*, 668 F.Supp. 294 (S.D.N.Y.1987). In *Christoforou*, this court ruled that for a hostile environment claim to be actionable, the sexually harassing conduct must "have the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Id.* at 301 (citing 29 C.F.R. § 1604.11(a)(3) (1986)). Successful hostile environment claims have depended on the existence of a "poisoned" atmosphere. *Bundy v. Jackson*, 641 F.2d 934, 945 (D.C.Cir.1981). However, "[a] female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII." *Carrero*, 890 F.2d at 578.

The case at bar is simply not analogous to the facts and allegations in *Christoforou*. This court discredited Christoforou's testimony and found it to be exaggerated. Further, one of plaintiff's witnesses, who turned hostile in the midst of her testimony, admitted that she had been asked by plaintiff to lie about her testimony. 668 F.Supp. at 299. Additionally, the presence of extremely vulgar and sexually-explicit graffiti in Danna's workplace that was continuously present for at least two years certainly amounts to more than "isolated incidents" of harassment. In addition to other graffiti written about her, Danna was forced to confront on a daily basis pictures such as the one depicting her with a penis in her mouth, and another picture associating her with an act of anal intercourse. (Plaintiff's Exhibit 19). Such depictions are "severe" both in regard to the level of their vulgarity and insofar as they were specifically directed at Danna. These depictions were venom that clearly poisoned Danna's work environment—poison that Danna had to endure daily for the "privilege" of working for Telco.

Second, Telco contends that it should not be held liable for the graffiti in the JFK terminal on the grounds that it did not own or exclusively control these areas. This argument is not persuasive. On at least one occasion, DePetro admitted that he authorized another employee to use Telco funds to spray paint over a certain graffito directed at Danna. (Tr. 1200). If DePetro believed that he had the authority to have some of the graffiti removed, it is not credible that he or other supervisors could not have had all of the offensive graffiti expurgated. Even if Telco supervisors did not have such authority, there is no indication that Telco contacted the JFK building management to see what could be done to have such graffiti removed. It was Telco's duty to take prompt remedial actions to eradicate graffiti in its workplace and it breached that duty. *See Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989); *Watts v. New York City Police Dept.*, 724 F.Supp. 99, 108 (S.D.N.Y. 1989) (defendant had an obligation to investigate whether acts conducive to the creation of a hostile environment did in fact occur and, if so, should have attempted to dispel workplace hostility).

Third, Telco claims that Danna cannot prevail under a hostile environment theory because she failed to show that she was tangibly injured by the alleged hostile environment.

Under a hostile environment theory, employer liability attaches when the sexual harassment has the "purpose or effect of unreasonably interfering with an individual's work performance *or* creating an intimidating, hostile or offensive working environment." *Christoforou*, 668 F.Supp. at 301 (citing 29 C.F.R. § 1604.11(a)(3)) (emphasis added). In *Meritor Savings Bank v. Vinson*, the Supreme Court clearly established that Title VII affords employees the right to work in an environment free from discriminatory intimidation, ridicule and insult, and relief is not limited to economic or tangible injury. 477 U.S. at 64, 65, 106 S.Ct. at 2404, 2405, 91 L.Ed.2d at 58, 59. In this case, the poisoned atmosphere in which Danna worked was at least

a partial cause for her seeking a demotion rather than risking further humiliation. (Tr. 166).

Thus the graffiti and vulgar comment served the purpose for which they were intended, to intimidate and demean Danna. They created a hostile atmosphere which is inconsistent with Title VII's goal of promoting sexual equality in the workplace. *See Meritor,* 477 U.S. at 64–67, 106 S.Ct. at 2404–06, 91 L.Ed.2d at 57–60. As such, it affected a privilege of her employment. Danna's failure to clearly adduce specific harm does not extinguish Telco's liability. *Bennett v. New York City Dept. of Corrections,* 705 F.Supp. at 986–87.

■ Finally, Telco argues that the graffiti and vulgar comment should not be considered "unwelcome" sexual harassment since Danna herself used foul language and engaged in graffiti writing.

Danna testified that although she wrote graffiti, she only wrote messages on the wall answering the graffiti directed at her. She maintained that she never used profanity in her graffiti and that she never wrote any derogatory statements. (Tr. 394–97). Danna also testified that after being suspended once for using foul language she ceased to direct such foul language at her supervisors. (Tr. 329, 829–30). In the instant case, Danna's use of foul language and writing graffiti "does not waive her legal protection against sexual harassment." *Swentek v. USAIR, Inc.,* 830 F.2d 552, 557 (4th Cir.1987) (quoting *Katz v. Dole,* 709 F.2d 251, 254, n. 3 (4th Cir.1983)). Danna's complaints to her supervisors about the graffiti clearly indicated that they were not welcome, and it cannot be said that Danna participated in the graffiti writing in the same manner in which it was directed at her. Thus, Danna has sufficiently established that the harassment was unwelcome.

In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court decided that its "perception of [plaintiff's] character is irrelevant. The Court sits not to determine whether Ms. Hopkins is nice, but to decide whether [her employers] reacted negatively to her personality because she is a woman." 490 U.S. at 258, 109 S.Ct. at 1795, 104 L.Ed.2d at 293. Similarly, this court is not here to evaluate Danna's behavior, but Telco's. Whether Danna used profanity in her workplace is irrelevant to the extent that it was not cited by Telco as a legitimate reason for her dismissal or downgrade.

### B.

■ Telco asserts that Danna's demotion was a result of two occurrences: its belief that Danna should no longer hold the Service Technician position and her supervisor's futile attempts to find her a position as a Frame Administrator.[2] As a result of wanting to demote Danna to the Frame but finding no available position, Schultz testified that his only alternative was to demote her to Administrative Clerk which was the next available position in his unit.

Danna rebuts Telco's argument with evidence that a number of Frame Administrator positions were open during the period in question—some of which were available inside of the UTP process and some outside of the UTP process. A number of these positions were in Queens. *See* Defendant's Exhibits G, H, I, and J. Telco placed 165 employees in Frame positions during the period June 1986 to April 1988, 49 of them in Queens. (Defendant's Exhibits G, I). Defendants asserted that Danna was ineligible to participate in the UTP system since she was on final warning and had received an unsatisfactory performance evaluation, therefore they had limited options: either to find her a Frame position through informal phone calls to other units which may have openings—which was ultimately unfruitful—or to demote her within the unit to the next lower job under Service Technician which was Administrative Clerk.

Defendants also testified that the Frame positions which were placed outside of the UTP system were only for extenuating cir-

---

2. Furthermore, shortly after she was downgraded, Salamone offered her a job as a Frame Administrator in the Bronx. (Tr. 1017). Danna refused this offer because she did not want to work in the Bronx.

cumstances: medical disabilities, surplus positions,[3] Article 36 lateral transfers to a new geographic area. (Tr. 1138–41).

Defendants' arguments may have been credible except for two glaring contradictions in their testimony and actions. First, Danna received a promotion to the Frame through the UTP system in April 1988 and was "qualified" to apply for such a position through the UTP system in February 1988, less than two years after institution of her final warning. Salamone acknowledged this fact. (Tr. 1076–77). He then admitted that it was indeed possible to receive a UTP transfer while on final warning.[4] (Tr. 1077). Second, defendants were able to find Danna a transfer to the Frame operation in the Bronx outside of the UTP system, yet were unsuccessful in Queens. Salamone admitted that, notwithstanding the fact that the number of UTP requests outnumbered the number of positions available for any one job title, supervisors were not prohibited from filling jobs outside of the UTP process which was indicated by the availability of this Bronx position. (Tr. 1074–75). What created such an extraordinary condition in the Bronx, but not in Queens, is unexplained by defendant when there were jobs available in Queens.

This court finds it difficult to accept these discrepancies as mere coincidence. Instead it finds that defendant was able to place Danna in the position she requested and for which she was qualified, Frame Administrator, and that instead of doing so, defendant delayed and thereby continued its harassment of plaintiff. The court further finds that defendant's harassment of plaintiff stems directly from the hostile environment which defendant created and for which Danna prevails in her sex discrimination claim. Not only did defendant create an environment from which plaintiff thought she needed to flee but defendant then made it impossible for her to leave without a substantial loss of earnings. Defendant continued this charade for nearly two years until April 1988 when Danna finally received a permanent Frame Administrator position.

## II. Disparate Treatment.

Danna's claim that she was discharged[5] and later demoted because of her sex is properly analyzed as a disparate treatment claim under Title VII. The Supreme Court set forth the allocations of burdens and order of presentation of proof in disparate treatment claims in a three-step process:

> First the plaintiff has the burden of proving by the preponderance of the evidence a *prima facie* case of discrimination. Second, if the plaintiff succeeds in proving the *prima facie* case, the burden shifts to the defendant "to articulate some legitimate non-discriminatory reason for the employer's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207, 215 (1981) ((quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973)).[6]

---

3. Although Salamone admitted that Danna's demotion to Administrative Clerk precipitated an overstaffing of administrative clerks, he denied that this created a "surplus" in his unit. (Tr. 1078).

4. Danna's supervisor in the Frame, Maslovs, testified that he had no idea that Danna had been dismissed and suspended on a Codes violation nor that she was on final warning when he "qualified" her to move to the Frame position—perhaps implying that her designation was in error. (Tr. 1134). It is just not believable that perusal of Danna's personnel file, which surely would have included notice of any final warn-

ing status, did not precede her transfer and thereby fully inform her new supervisor.

5. Danna was discharged May 10, 1986 as a result of violations of The Codes We Work By. Her dismissal was later revoked and converted to a suspension. She was reinstated in June 1986. (Tr. 340, 874).

6. In *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Court adopted a mixed motive analysis for Title VII claims. The Court decided that "we also know that Title VII meant to condemn even those decisions based on a mixture of legitimate

To establish a *prima facie* case, Danna must show: "1) she belonged to a protected class, 2) she was qualified for her position, 3) she was discharged, and 4) her discharge occurred under circumstances giving rise to an inference of sex discrimination." *Lopez v. Thomas, Inc.*, 831 F.2d 1184, 1188–89 (2d Cir.1987).

### A. Disparate treatment in Danna's demotion.

■ Essentially Danna claims that she was demoted in violation of Title VII under two different theories. First, she claims that the demotion itself was discriminatory. Second, she claims that even if the decision to demote her was not discriminatory, the degree to which she was demoted was discriminatory. In regard to both of these claims, Danna has sustained her burden of establishing a *prima facie* case under the disparate treatment analysis set out in *Burdine.*

Danna has shown that she was demoted from a Service Technician to Administrative Clerk. She has also submitted evidence that her work as a Service Technician was satisfactory. Further, Danna was the only female Service Technician in her unit. In addition, the degree to which she was demoted was virtually unprecedented and this was done despite the fact that her supervisors testified that she was fully qualified for the job of Frame Administrator. (Tr. 928–29). The fact that Service Technician was a typically "male" job is obvious from the record and Danna was the only female Service Technician at JFK Airport. By contrast, most of the Administrative Clerks were women, to the extent that it was thought to be a "female" job. (Tr. 103).

Given plaintiff's offer of several comments directed at her by male Telco employees which are derogatory and, in some cases, specific to her as a woman, the court is persuaded that there is an inference of sex discrimination in her demotion. Specifically, a co-worker is alleged to have told Danna, in response to a benign question, that what she needed "was a good fuck in the ass." She was regarded as a "pain in the ass" and a "ball buster." According to Esposito, DePetro urged her to write up a complaint on Danna while saying to her that "one way or another" he would get this "bitch." (Tr. 450–53). Esposito testified that she was told by DePetro that if Danna acted more "feminine, cutesy," she could get the other technicians to do her work for her.[7] (Tr. 432). While not specific to her demotion, these comments decisively show the environment in which this demotion occurred as well as the attitude toward Danna of her supervisors who were instrumental in obtaining her demotion.

In reply to Danna's *prima facie* case, Telco has offered a number of reasons why Danna was demoted and given the position of Administrative Clerk. First, Telco claims that Danna was demoted because she, herself, had asked to be demoted to the Frame Administrator position. Second, Telco claims that Danna was demoted because her productivity was low. Third, Telco asserts that Danna was demoted to Administrative Clerk because no Frame positions were available.

Danna has proved to this court by a preponderance of the evidence that Telco's

---

and illegitimate considerations" but left room for a court to determine that "the decision would have been the same if gender had not been taken into account." 490 U.S. at 241, 109 S.Ct. at 1785, 104 L.Ed.2d at 282. There the District Court found that Price Waterhouse utilized legitimate and illegitimate criteria (sex stereotyping) in evaluating plaintiff for partnership in the firm. The Supreme Court upheld that finding. 490 U.S. at 255, 109 S.Ct. at 1793, 104 L.Ed.2d at 291. On the facts before this court there is no "direct evidence" on the record which shows that defendant used gender-based criteria in Danna's demotion or discharge, therefore, we use a *McDonnell Douglas* and *Burdine* analysis, rather than the *Price Waterhouse*

analysis. *See Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1568 (2d Cir.1989); *Halbrook v. Reichhold Chemicals, Inc.*, 735 F.Supp. 121, 125 (S.D.N.Y.1990); *George v. United States Postal Service*, 1989 WL 71162, 1989 U.S. Dist. LEXIS 6878, at 5 n. 1. (S.D.N.Y.1989).

**7.** It is significant that we credit the testimony of Esposito in these determinations. She was a supervisor and employee of Telco for 25 years. She was not a personal friend of Danna's and had worked with Danna on brief assignments. At the same time, Esposito was held in esteem by the defendant supervisors.

above asserted reasons were pretextual and that their motives were discriminatory and based on sex. As to Telco's first and third arguments, the court, as previously stated, finds that at least part of the reason why Danna requested a demotion was to escape the hostile environment to which she was subjected. Secondly, as elaborated upon in the section on hostile environment, it is not credible that Telco could not find a Frame Administrator position for Danna. Finally, the court finds that Telco's argument that Danna was demoted due to her low productivity is not credible.

Both Schultz and Salamone were responsible for Danna's downgrade to an Administrative Clerk's position. Schultz testified that, for him, the decision to demote Danna was a result of several factors: a drop in her productivity, her refusal to go back to school for training, her desire to be downgraded, and the absence of an available Frame Administrator position. (Tr. 855). Additionally, he relied on the written and verbal evaluations of Joe Guthlein and Betty Sutton. (Tr. 927–28).

Danna claims Schultz's reasons for her demotion were pretextual insofar as he claimed that: 1) Danna's performance had slipped when it had in fact improved to the point where she was meeting the expected productivity level, and 2) Schultz said he relied on written reports that were in fact not submitted until after the decision was made to downgrade Danna. Danna argues that even if her performance was quantitatively lower than her co-workers', there were good reasons for this differential. First, the installers in her unit had 10 to 25 years of experience in installation—experience which she did not have. Second, although Danna repeatedly asked for on-the-job training by an experienced installer, she was never given this training.[8]

Furthermore, testimony showed that three other technicians had similar or lower productivity than Danna and that these employees were not demoted. (Plaintiff's Ex-

hibits 7–11). Furthermore, Remsen testified that he had never disciplined another employee for not meeting production levels but instead had talked to them. (Tr. 1352). It is simply not credible that defendant demoted Danna because her productivity did not compare to men who had ten to twenty-five years more experience. At the same time, it is undisputed that Danna's qualitative performance as a Service Technician was satisfactory and that her productivity had improved to the expected output level the month before she was demoted.

The court views these facts against a background which consists of Danna being subjected to a hostile environment and being twice removed from her unit. By looking at the actions and statements of defendant, the court finds that Telco's supervisory employees as noted wanted Danna out of the all-male Service Technician position.

· Because of the facts and incidents discussed above, it is the opinion of this court that Danna has sustained her rebuttal burden of showing that the reasons which Telco offers for her demotion were pretextual. Therefore, the court holds that defendant's demotion of plaintiff was based on her sex and constituted illegal sex discrimination.

### B. Danna's Discharge.

■ In regard to her discharge, which lasted a period of one month, Danna has failed to establish that she was discharged due to sex discrimination. At trial, Telco established that Danna was discharged for violating Telco's "Codes We Work By" which prohibits employees from being off the job without supervisory permission and from falsifying work records. Danna admitted that she was aware of Telco's policy and that she could be dismissed for such violations on the first occurrence. She also admitted that she often extended her morning coffee break and her afternoon breaks without her supervisor's permission. Telco

---

**8.** The only installer Danna was paired with for training purposes while in the unit was Dennis Shea. Shea refused to let her do any of the work, yelled at her in front of customers and, in less than a month after returning from his

Codes suspension, left the company. Salamone admitted knowing that Shea had been to the company's drug rehabilitation center (Tr. 1083), and Esposito testified that Shea was "explosive" and "known to be on drugs." (Tr. 522–23).

supervisors observed Danna impermissibly off the job on at least three separate occasions.

On one occasion she offered no explanation for approximately a two-hour absence from work. Danna's explanations for the other two occurrences are less than credible; she was unable to account for her presence at the diner when her supervisors questioned her about it only three days later.

Danna also has failed to show that similarly situated male employees were not dismissed. Dennis Shea, another employee in Schultz's chain of command was dismissed for being found off the job on just one occasion. Even if it were true that other male employees similarly extended their break times, Danna simply did not sufficiently prove that the supervisors were aware of this practice on the part of particular male individuals and failed to take disciplinary action against them.[9]

Even if Danna had established a *prima facie* case of sex discrimination in this discharge claim, she did not present sufficient evidence to prove that Telco's proffered reasons for discharging her were pretextual, especially in light of the fact that a greater number of men were discharged for violating the codes.

*Conclusion*

█ Danna has proven, by a fair preponderance of the credible evidence, that she was discriminated against on the basis of her sex by being subjected to a hostile work environment. Danna has also proven that her demotion, but not her discharge, was the result of prohibited sex discrimina-

tion. She is, therefore, entitled to damages in the form of reinstatement to her position as Service Technician and backpay. Because neither plaintiff nor defendant has produced clear evidence of the salaries of the position of Service Technician, Administrative Clerk and Frame Administrator for the years involved, this court requires such additional evidence before an appropriate award may be determined. In addition, this court will enter an injunction prohibiting Telco from further engaging in discriminatory conduct towards Danna and requiring Telco to remove any remaining graffiti.

9. Danna contends that she was unable to prove such favoritism because, although Telco admitted that other employees were surveilled and reports written, it did not produce these surveillance reports of male employees which, plaintiff asserts, would show that male employees were extending break times but were not disciplined. Danna argues that Telco's failure to produce the surveillance reports raises an adverse inference against defendant. This court will not make such an adverse inference. Danna did not subpoena such documents during the discovery phase of the case. Defendant contends that the surveillance reports were not ordinarily thought relevant to such a suit and, innocently, have

been destroyed. Telco argues that it had no way of knowing these documents would be necessary for trial, therefore there should be no adverse inference. *See Nationwide Check Corporation, Inc. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217–218 (1st Cir.1982) (inference depends on showing that party had notice that the evidence was relevant at the time it was destroyed or was not produced). This court agrees that, because Telco had no reasonable notice of the need to retain *other* employees' surveillance reports and plaintiff did not subpoena such documents, defendant prevails on this issue.